[No. 39197.    Department Two.    November 30, 1967.]

THE STATE OF WASHINGTON, *Respondent*, v. LAWRENCE
C. SHAFFER, *Appellant.*\*

*William F. Lockett*, for appellant.

*Charles O. Carroll* and *David H. Beitz*, for respondent.

WARD, J.†—The defendant, Lawrence C. Shaffer, was
charged with arson in the first degree by aiding and abet-
ting one Clarence M. Scott in setting fire to a dwelling
house in Seattle. He was tried, convicted and sentenced,
and now appeals from the judgment entered.

The one assignment of error on appeal is based on the
court's denial of his motion for a new trial.

It is necessary to set out only the facts which bear on this
one claim of error. There was evidence from which the jury
could find these facts to be as follows. On May 8, 1966,
Betty Powell, her friend Rose McNair and others were
dining at a downtown club. They were approached by the
defendant and his wife, and an argument ensued over a

\*Reported in 434 P.2d 591.

---

†Judge Ward is serving as a judge pro tempore of the Supreme
Court pursuant to Art. 4, § 2(a) (amendment 38), state constitution.

coat which Mrs. Powell was wearing, Mrs. Shaffer apparently believing the coat to be hers. When Mrs. Powell and her party left the club they were followed by the Shaffers and near the Powell home further controversy took place and considerable hostility was evidenced.

On May 11, 1966, the defendant offered and later paid Clarence M. Scott, a 17-year old boy, the sum of $50 to burn down the home occupied by Mrs. Powell and her family. On the same day, Clarence M. Scott met a 15-year old friend, Gregory Warren, and offered to divide the $50 with Warren if he would help him in setting the fire. He refused to participate. At that time Gregory Warren got the impression that it was the home occupied by Rose McNair and her family which was to be burned down, and on May 13, 1966, he told Mrs. McNair of his conversation with Clarence M. Scott. After Gregory Warren refused to participate, Clarence M. Scott purchased a can of gasoline with money furnished him by the defendant, poured the gasoline on the exterior of the Powell home and ignited it, partially destroying the dwelling.

After the fire, Rose McNair, who had been a friend of Gregory Warren for sometime, induced him to go with her to the police and make a statement, and she later induced Clarence M. Scott to make a statement of his participation in the crime.

At the trial the state called Gregory Warren as a witness, and on cross-examination he testified:

Q. Did you make a statement to the effect that you were paid two dollars to sign a statement? A. Yes, I was. Q. You were paid two dollars to sign a statement against Larry Shaffer. Right? A. (Witness nods affirmatively.)

After the state closed its case the defendant called Gregory Warren as one of its witnesses and the following testimony on direct and cross-examination was given with respect to the payment of the $2.

Q. Now you discussed this matter with a Rose McNair, is this correct? A. Yes. Q. And she paid you two dollars to sign a certain statement, is this correct? A. Well, she

gave me two dollars but I wouldn't say it was to sign it. She did give me two dollars. Q. She did give you two dollars? A. Yes. Q. And then you signed the statement. Did you get your two dollars before you signed the statement? A. No, I got it after. You see, I came over to her house on Saturday and asked her for some money and she told me she didn't have it. I came back Sunday morning and she gave me some money and her baby sitter and the kids and I left and went to the show. MR. LOCKETT: That's all. CROSS-EXAMINATION BY MR. BEITZ: Q. Just a couple of questions, Gregory. Now Rose gave you two dollars on Sunday, is that correct? A. Yes. Q. And was this to go to a movie? A. Uh-huh. Q. Had you received money from her on previous occasions in small sums to go to the movie or for personal expenses? A. Yes. She gave me money lots of other times. MR. LOCKETT: What was the answer? I didn't hear it. THE WITNESS: She gave me money for baby-sitting. I used to be a baby sitter. Q. (by Mr. Beitz) That is what the money was for? A. Yes. Q. You made your original statement to Inspector Timlin on Saturday morning, is that right? A. Uh-huh. Q. So the two dollars had absolutely nothing to do with your statement to Inspector Timlin? A. That two dollars? Q. Yes. A. No, it didn't have nothing to do with that. Q. Was your statement true that you gave to Inspector Timlin? A. Yes.

Later defense counsel was granted the right, on a claim of surprise, to cross-examine Gregory Warren and further testimony was given as follows:

Q. (by Mr. Lockett) Now this morning you did testify that Rose McNair gave you two dollars to sign a statement, is that correct? Was that your testimony this morning? A. Yes. Q. Speak out. Is it yes or no? A. Yes. I didn't mean it exactly the way you put it. Q. But that was your testimony, wasn't it? A. Yes. MR. LOCKETT: That's enough. RECROSS-EXAMINATION BY MR. BEITZ: Q. What did you mean? A. She did give me two dollars after I wrote the statement. She did give me two dollars. I wouldn't say it was for writing the statement, though, but she did give me two dollars after I wrote the statement.

Later on the opening of court on the last day of the trial, defendant's counsel made a statement to the court to the

effect that Gregory Warren had called him by telephone the prior evening and had told him that the reason that he, Gregory Warren, had testified as set out above was because Rose McNair, during the noon hour, had "told him that if he did not change his story and testify according to what she said that he—she rather—that he would never leave this courtroom or she would have him whipped, and this is the indication as to why he changed his testimony."

The following is a part of the colloquy between the court and defense counsel following this disclosure:

THE COURT: Now the reason that he received the two dollars at most would be a collateral issue so you are not asking the Court for permission to reopen and therefore the Court will take cognizance of the matter which you have referred to and immediately at the conclusion of the trial the Court is desirous of having Gregory, his mother and Mrs. McNair present to determine whether or not there has been any attempt to coerce or impose any duress upon any of the witnesses. MR. LOCKETT: May it please the Court, the reason I did not ask to reopen is because I don't believe I would be in order in asking the Court to reopen on this type of issue, especially where it is a collateral issue. THE COURT: All right. MR. LOCKETT: Thank you. THE COURT: In any event, I would request that arrangements be made to have the witness available with Mrs. McNair, Mrs. Warren, the boy's mother, or whoever else may be involved in this matter so that we can determine the facts.

After the jury had retired to deliberate upon its verdict, the court interrogated Gregory Warren who admitted that he had telephoned the defendant's counsel the evening before, but denied that the conversation related to the receipt of the two dollars. The court asked:

All right. Did it relate to this question of the two dollars or didn't it, or what? GREGORY WARREN: No, it didn't have nothing to do with that.

Later the court asked:

The issue which would come before the Court, Gregory, would be whether or not during the course of your testimony in any way you told an untruth. GREGORY

WARREN: I told the truth. Everything I told was the truth. THE COURT: Very well. I am not going to inquire further at this point.

It is the defendant's position that Gregory Warren was threatened by Rose McNair prior to the time he testified as a witness for the defendant and that his testimony was influenced by such threats. It is the defendant's position that he was denied due process of law because the testimony of this witness was induced by fear or threats and that his motion for a new trial should therefore have been granted.

From the colloquy above quoted between the court and defense counsel, it is apparent that the defense did not desire a reopening of the testimony in order to further impeach the testimony of Gregory Warren. If a new trial were granted to the defendant, Gregory Warren could again be called as a witness by either party and the testimony which he gave as a state's witness on a new trial would be subject to impeachment by showing his prior friendship with Rose McNair, his receipt of the two dollars from her, and by showing any threats of whipping or other bodily harm which may have influenced his testimony. It is apparent that the court did not deny the defendant the right to reopen his case for the purpose of further impeaching the testimony of this witness. The defendant does not point out what testimony he would present if a new trial were granted other than what he could have presented if he had requested permission to reopen the case for the further impeachment of this witness.

It might appear from the record that the defendant wished to have the court rather than the jury determine that Gregory Warren had given false testimony under the influence of monetary award or fear and threats. This, however, is a matter which should be passed upon by the jury in the light of all the impeaching evidence available to the defendant. As we said in *State v. Katon,* 47 Wash. 1, 3, 91 Pac. 250 (1907):

While a conviction of the crime of perjury disqualifies a person from testifying as a witness in the absence of a reversal or pardon, no other disqualification of this sort exists. *State v. Pearson,* 37 Wash. 405, 79 Pac. 985. Any person, despite his character or previous conduct, may be a witness, although his character or conduct may be shown to affect his credibility. The witness, therefore, being a lawful one, it is not the province of this court to weigh her testimony.

■ Even if a witness recants vital testimony subsequent to the trial, this does not of itself require the granting of a new trial. If a new trial should be required in all such cases, then the right to a new trial would rest with recanting witnesses, not with the court. In *People v. Shilitano,* 218 N.Y. 161, 180, 112 N.E. 733 (1916), Judge Cardozo, in a concurring opinion, states the duty of a trial judge as follows:

Three witnesses for the prosecution have stated under oath to the trial judge that their testimony upon the trial was false. It became his duty to say whether they were conscience-stricken penitents, or criminal conspirators to defeat the ends of justice.

The rule in this state finds expression in *State v. Elliott,* 6 Wn.2d 393, 394, 107 P.2d 927 (1940):

Of course, a new trial is not a matter of right simply because some witness has recanted his testimony. Whether a new trial shall be granted or denied under such circumstances, is a matter within the discretion of the trial court. *State v. Wynn,* 178 Wash. 287, 34 P. (2d) 900; *State v. Snyder,* 199 Wash. 298, 91 P. (2d) 570. And only in cases where there is manifest abuse of its discretion by the trial court will this court intervene. *State v. Powell,* 51 Wash. 372, 98 Pac. 741.

Here we do not find even complete recantation by the witness. At most, we have a witness whose testimony has been effectively weakened. It is apparent that the court did not deny the defendant an opportunity to further discredit the testimony of the witness. The proper evaluation of this witness' testimony was the function of the jury. The denial

of the motion for new trial upon the issue presented was correct.

The judgment is affirmed.

FINLEY, C. J., DONWORTH, HUNTER, and NEILL, JJ., concur.