911 P.2d 1004 (1996)
128 Wash.2d 784
The STATE of Washington, Respondent,
v.
Michael MACON, Petitioner.
No. 62910-2.
Supreme Court of Washington, En Banc.
March 7, 1996.
Andrew L. Subin, Vashon, Nielsen & Acosta, Eric Nielsen, Seattle, for Petitioner.
Norm Maleng, King County Prosecutor, John Belatti, Deputy, Cynthia Gannett, Deputy, Lee Yates, Deputy, Theresa Fricke, Deputy, Seattle, for Respondent.
*1005 SMITH, Justice.
Petitioner Michael Macon seeks review of an unpublished decision of the Court of Appeals, Division One, affirming his conviction in the King County Superior Court for second degree child molestation (Count I) in violation of RCW 9A.44.086 and first degree rape of a child (Count II) in violation of RCW 9A.44.073 and a ruling by the trial court which denied his motion to vacate judgment on the first degree rape charge and motion for new trial. We granted review limited to the issue of recantation by the child victim. We affirm.

QUESTION PRESENTED
The limited question presented in this case is whether the trial court erred in concluding after a hearing that a child victim's recantation of trial testimony of sexual abuse by Petitioner was unreliable, thus denying Petitioner's motion to vacate judgment upon his conviction of first degree rape of a child and his motion for a new trial.

STATEMENT OF FACTS[1]
The victim, T.S., was born on April 1, 1985.[2] Her mother is Ms. Michelle Short.[3] Ms. Nancy S. Scribner, Ms. Short's mother, is T.S.' grandmother. Petitioner Michael Macon met Ms. Short and began living with her and her daughter, T.S., in Seattle in 1987.[4]
In 1988, three-year-old T.S. told her mother and a counselor that "Michael" sexually abused her with a wooden spoon and fork. At that time male cousins named Michael and Dominique also lived with T.S., her mother and Petitioner. Initially Ms. Short and the counselor were unsure whether the child was referring to her cousin Michael or to Petitioner. Child Protective Services (CPS) investigated the report and initially concluded Petitioner was the purported abuser. T.S. later identified her cousins Michael and Dominique as the abusers, and not Petitioner.[5] After further investigation, including evaluation by the Seattle Sexual Assault Center, no charges were filed because of inconclusive results. T.S. was not examined for sexual abuse at that time.
On February 4, 1991, based upon events happening in September 1990, Petitioner was charged by information in the King County Superior Court with child molestation in the second degree involving thirteen-year-old D.S. (count I) and rape of a child in the first degree involving five-year-old T.S. (count II),[6] the count at issue on this appeal.
On June 4, 1991 the trial court, the Honorable Jerome M. Johnson, conducted a pre-trial hearing to determine competency of the child victim, T.S., and reliability of hearsay testimony in corroboration. The court ruled the child was competent to testify and that hearsay testimony would be allowed at trial.[7]
The trial began on June 5, 1991 before a jury in the King County Superior Court. The jury on June 11, 1991 found Petitioner "guilty" of both charges. On September 16, 1991, the court sentenced him to 48 months on Count I and 120 months on Count II.

EVIDENCE AT TRIAL
On Thursday evening, September 20, 1990, Ms. Michelle Short took her daughter, T.S., to the home of her mother, Ms. Nancy S. *1006 Scribner, to spend the night.[8] That night, T.S. told her grandmother, Ms. Scribner, "my private part hurts."[9] The grandmother looked at T.S.' vaginal area and noticed it looked "quite red."[10] She then asked the child whether she hurt herself.[11] T.S. said "no" and then said "mommy's Michael" had put his fingers inside her and hurt her.[12] Ms. Scribner asked T.S. more questions. The child said she was lying on her bed in her nightgown when Petitioner came in and put his fingers inside her.[13] She said it happened when her mother, Ms. Short, went to the store and left her with Petitioner. She could not give a date.[14] Ms. Scribner immediately told her husband what the child had told her.
In testimony at trial, Ms. Scribner referred to sexual abuse of T.S. in 1988 by the child's cousin Michael. She testified that during that time, she and another daughter, "Becki," tried to gain custody of T.S. because Ms. Short did not properly care for the child.[15]
The grandmother testified that on September 20, 1990 she took T.S. for an examination at Swedish Hospital in Seattle where T.S.' doctor, Dr. Marshall Murrey, M.D.[16] worked. But Dr. Murrey was not there. Dr. Mary Hulseman, M.D. tried to examine T.S., but the child became hysterical and initially would not let Dr. Hulseman touch her. However, Dr. Hulseman did briefly examine the child and testified her vaginal area looked "somewhat reddened" and "irritated."[17] She said T.S. did not answer her questions about anyone touching her, but did say Petitioner hit her with a switch, and not a wooden spoon. Dr. Hulseman testified about arranging for a CPS referral and referred the child to the Seattle Sexual Assault Center at Harborview Medical Center.[18]
Early in the morning on September 21, 1990 Dr. Murrey telephoned Ms. Scribner. He told her T.S. was referred to Dr. Mary Gibbons at Seattle Sexual Assault Center at Harborview for an appointment that same day. He spoke by telephone with T.S. Reading from his dictated notes, Dr. Murrey testified that T.S. told him "Michael, her mother's boyfriend, did touch her `privates' and has whipped her with a switch."[19] First, she told Dr. Murrey it happened "one month ago," then she said it happened "two days ago."
The grandmother took T.S. to the Sexual Assault Center late in the morning on September 21, 1990. They met first with Ms. Kathy Marks, a social worker, and Dr. Mary Wedegatertnen, M.D., a pediatric resident.[20] Ms. Scribner spoke with Ms. Marks and Dr. Wedegatertnen and then left the room while the two talked to T.S. alone.
*1007 Ms. Kathy Marks testified that Ms. Scribner told her CPS investigated the family in 1988 for the "same thing" by the "same person,"[21] and that she tried to gain custody of T.S. then and was going to try again. Ms. Scribner also told Ms. Marks T.S. had a history of sexual and physical abuse.[22] Ms. Marks testified she asked T.S. if she had an "ouie" and T.S. said she did, pointing to her vaginal area, and said her mother's boyfriend Michael touched her with his hand, and that it happened in her bedroom.[23]
Dr. Mary Gibbons, M.D. spoke to Dr. Wedergatertnen about T.S. and reviewed Dr. Wedergatertnen's notes on the child.[24] Dr. Gibbons testified that T.S. said in Dr. Wedergatertnen's presence "Michael touched me in my private parts" and he used his hand.[25] T.S. first said it happened "two days ago," then she said "yesterday." The child denied that Petitioner touched her with any other part of his body. Then she stated he had, but was unclear about what other parts of his body he had touched her with. She then told Dr. Wedergatertnen "Michael" spanked her with a wooden spoon and with a tree stick.[26]
In the examining room a sedative was administered to T.S. so the doctors could examine her because the child was resistive. While she was being sedated she became extremely combative and yelled obscenities at her grandmother, who was holding her down. She also made statements like "get off of me" and "don't hurt me." Dr. Gibbons testified children sometimes get fussy or agitated while going under sedation, but she could not reach any specific conclusions about the child's behavior.[27]
Both Dr. Wedergatertnen and Dr. Gibbons then examined T.S.' vaginal area. Some of the labial tissue tore easily during the examination, a condition called "friability."[28] Dr. Gibbons testified this condition was "very uncommon" in children without a history of sexual abuse, pointing to only one good study on the subject.[29] Dr. Gibbons also testified she found a small, white line of scar-like tissue near the edge of T.S.' vagina. The hymenal opening measured eight millimeters across, and Dr. Gibbons testified it was larger than normal for a child of T.S.' age. She found a notch on the hymen, which she testified was very unusual in children who had not been sexually abused, but occasionally a child was born with the condition. She said her physical findings were consistent with digital penetration of T.S.' vagina. She concluded T.S. had a history of sexual and physical abuse.[30] But upon cross-examination, she testified some of the conditions found were consistent with either recent injury or injury from several years ago.[31]
Ms. Margo Coad, a CPS caseworker assigned to T.S.' case, testified about her interview with T.S. in the Scribners' home on September 25, 1990. She testified that T.S. told her she was afraid of Petitioner and did not like living with him. The child said Petitioner had touched her between her legs in her bedroom when she was by herself. But she told Ms. Coad that Petitioner also touched her friend "Rachel," who was with her, and they called the police about it. Ms. Coad believed T.S.' comments about calling the police were "fantasies" because there was no police report of the call.[32] Ms. Coad also testified she believed T.S. was referring to recent sexual abuse and not to past sexual abuse.
The child, T.S., stayed temporarily with the Scribners seven to ten days after her disclosure, but then was returned to her *1008 mother.[33] During her temporary stay with the Scribners, she made two drawings which she described to her grandmother. She told her grandmother one drawing showed "[T.S.] in her bed when Michael hurt her." Ms. Scribner testified that she then wrote the child's description on the drawing. She dated this and the other drawing October 1, 1990.[34]
The grandmother also testified that shortly after T.S.' statements about Petitioner, the child exhibited some behavioral changes. Ms. Scribner testified she had a "bop-bag" in her home for the child, who called the bop-bag "Michael." She said T.S. would beat on the bag and say "You'll never hurt me again Michael." She had never seen T.S. behave like that before. She said T.S. was also extremely angry, especially with her mother; she wet her bed, although she was toilet-trained; she had school problems; and was afraid of men.[35] Dr. Gibbons testified that sexually abused children sometimes exhibit behavioral changes, including extreme anger or bed-wetting.[36]
Seattle Police Detective Timothy M. Luckie investigated T.S.' allegations and took notes in an interview of the child on October 1, 1990.[37] Daniel J. Soukup, a deputy prosecuting attorney, conducted most of the interview. Ms. Margo Coad, the CPS caseworker, was also present. Referring to his notes, Detective Luckie testified that Mr. Soukup asked T.S. if someone touched her private parts in a bad way, and she replied "Mommy's Michael." The child said Michael touched her with his hand and that it happened "one time" at home, just before she moved to her grandmother's. She said it happened in the backyard while she was playing baseball, when her mother was at a meeting and Petitioner was baby-sitting. In answer to other questions by Mr. Soukup, T.S. said she was by herself when Petitioner touched her and she wore a yellow blouse and a purple and white skirt with pink underwear. She said Petitioner wore blue pants and a red shirt. She stated she told her mother about the incident the day it happened. Mr. Soukup asked T.S. what her mother did and T.S. said her mother told Michael to leave and never come back.[38] Detective Luckie testified that at some point in the interview he told T.S. he had a five-year-old daughter. She then asked him to leave the room, and he thought this was because of "[m]aybe jealousy the fact that I was bringing someone else up."[39]
At trial, T.S. testified that Petitioner touched her "private parts" with "his hand." She said it happened "once" "a long time ago" in her bedroom when her mother was "at a meeting." She said she told her grandmother (Ms. Scribner) first what happened. She also testified she did not like Petitioner because he was mean.[40]
Ms. Michelle Short, T.S.' mother, testified at trial she was "having a hard time believing" T.S.' accusation against Petitioner.[41] She confirmed that T.S. had told her her "privates" hurt on September 20, 1990, but she thought it was because of poor hygiene, and she just told the child to wash herself better.[42] She testified that until a few weeks before the trial, T.S. told her Petitioner did not abuse her. But she said a few weeks before the trial T.S. began telling her Petitioner did abuse her, and T.S. made such statements in the presence of other people, *1009 but especially before her grandmother, Ms. Scribner.[43] Ms. Short testified she felt her mother, Ms. Scribner, was "obsessed" with T.S. and feared her mother would again attempt to get custody of the child.[44] She also testified about the difficult relationship she had with her mother.[45]
A fourteen-year-old second cousin of Ms. Short, D.S.,[46] testified that on September 21 and September 22, 1990 she was at Ms. Short's home. She testified that while she was there, Petitioner touched her breasts, buttocks and vaginal area over her clothing.[47] D.S.' mother, Ms. Kathlene Ayson, also testified regarding statements D.S. made to her about the incident shortly after it happened.[48] This was the basis for Count I, not at issue before this court.
Petitioner testified at trial and denied the accusations of both T.S. and D.S.[49]
The jury on June 11, 1991 found Petitioner "guilty" on both counts. The court entered judgment and sentence on September 16, 1991.[50]

RECANTATION HEARING
On December 23, 1992, Petitioner's new counsel filed a motion to vacate judgment as to count II under CrR 7.8(b)(2) and (5),[51] basing his motion upon the ground that T.S. consistently recanted her testimony. The trial judge, the Honorable Jerome M. Johnson, heard testimony on the motion on March 23, 1993. T.S. was then seven years old, having been five years old when she testified in the 1991 trial.
At the hearing on the motion, the child, T.S., testified she did not remember being in court before. She said she remembered telling people "Michael" sexually molested her but said she was talking about her cousin. On direct examination by Petitioner's counsel, she repeatedly denied that Petitioner had ever molested her.[52] She explained that:
[M]y grandma thought that I was talking about my mom's boyfriend. And then I didn't want to make my grandma mad, that I lied. Then I thought if I told her that lie that she wouldn't love me.[[53]]
The child, T.S., also testified she told her aunt, her mother, her mother's friends and her therapist, Ms. Janet Keen, that Petitioner did not molest her.[54] During cross-examination, T.S. initially indicated she did not remember the judge or the prosecutor, but then acknowledged seeing the prosecutor in the hallway before the hearing and saying she remembered him then.[55]
The child's mother, Ms. Macon [formerly Ms. Short], and Ms. Lisa Grenier, one of her baby-sitters, also testified at the hearing. Both women said T.S. told them she had lied when she accused Petitioner of touching her. Ms. Macon [formerly Ms. Short] indicated T.S. had been saying this to her "[f]rom the very beginning" and Ms. Macon [formerly *1010 Ms. Short] said she testified to that effect at trial.[56] Ms. Macon [formerly Ms. Short] also said T.S. had complained that her private parts hurt within a month before the hearing. She said a doctor diagnosed T.S.' vaginal redness and irritation as the result of poor hygiene. She said the condition occurred frequently.
Ms. Bonney McCormick, a court appointed special advocate (CASA), was the final witness testifying at the hearing. She was asked to investigate Petitioner's case when Ms. Nancy S. Scribner and her husband sought court-ordered visitation with T.S. Ms. McCormick talked with the Scribners, T.S., Ms. Macon [formerly Ms. Short], Ms. Keen, and the CPS caseworkers. She also reviewed medical records and school records. Ms. McCormick testified that Ms. Keen described T.S. as "a very malleable young woman" who "says what she thinks people want to hear, that it happens in a number of instances, not only in this particular instance."[57] Ms. McCormick agreed with Ms. Keen's assessment and found T.S. "very eager to please."[58]
The trial court denied Petitioner's motion to vacate judgment as to count II and entered the following Findings of Fact and Conclusions of Law on May 6, 1993:

FINDINGS OF FACT

I.
[T.S.] is the alleged victim on count II (rape of a child in the first degree) in the above-entitled case. A jury convicted the defendant as charged on June 11, 1991. Sentencing occurred on September 16, 1991. At trial, it was alleged by [T.S.]' mother, Michelle Macon (hereinafter "[T.S.]' mother"), that [T.S.] had recanted to her the allegations of sexual abuse ... [T.S.]' mother did not, and does not, believe the allegations against the defendant.

II.
At the time of trial, [T.S.] was 5 years old and living with her maternal grandmother, to whom she first disclosed the abuse. After trial, [T.S.]' mother took custody of her. Over a year after the defendant was convicted and sentenced on count II, [T.S.] allegedly recanted to Lisa Grenier[,] a friend of [T.S.]' mother.

III.
One and a-half years after [T.S.] testified at trial, it is reported that she is an impressionable child and that she has apparently recently become malleable to what others want her to say. [T.S.] has a disbelieving mother, who has her own emotional difficulties as well as difficulties with [T.S.]' maternal grandmother. Earlier in [T.S.]' life and during the time the allegations against the defendant were made, this maternal grandmother was an undenied source of stability and affection in [T.S.]' life. After trial, [T.S.]' mother denied the grandmother any contact with [T.S.].

IV.
[T.S.]' mother married the defendant 3 weeks after he was sentenced for his abuse on [T.S.]. Since sentencing, [T.S.] has had phone contact with the defendant (arguably in violation of the court's no contact order) to say she was sorry she lied at trial. Although he has not lived with [T.S.] since the trial, [T.S.] now refers to the defendant as "daddy." This may be understandable since her mother has married the defendant, but it is acknowledged that defendant is not [T.S.]' natural father.

V.
[T.S.] recanted her trial testimony at this hearing. She testified she does not recall the trial. [T.S.] stated the defendant had never touched her and that she never told people he did. That she never told people is inaccurate and contrary to her trial testimony.

*1011 VI.
The court does not believe that the maternal grandmother influenced [T.S.] to give false testimony at trial, as argued by [T.S.]' mother. The trial allowed the defendant the opportunity to challenge the grandmother and prove the suggestibility of [T.S.]. This challenge was unsuccessful.

VII.
At trial, [T.S.] testified to the defendant touching her in her "private parts." This testimony was corroborated by medical evidence, [T.S.]' behavior changes, the drawings which were admitted into evidence and the child hearsay statements offered through other witnesses.

VIII.
In light of the above circumstances, the court is not persuaded that [T.S.]' recantation is genuine. Further, the court finds the recantation testimony is untrustworthy and unreliable.

CONCLUSIONS OF LAW

I.
The defendant has not established by a preponderance of the evidence all five of the factors necessary for a motion for a new trial. (footnotes omitted) While the recantation testimony of [T.S.] would be material and not just impeaching at a new trial, the record indicates the results of the trial would not likely change from such evidence. Moreover, due to the court's finding that the recantation is unreliable, whether such evidence could have been discovered before trial has not been established.

II.
In light of the questionable circumstances surrounding the recantation and the findings set forth above, defendant's motion to vacate judgment as to count II and for new trial is hereby denied.
(Emphasis added.)
On May 6, 1993 Petitioner appealed the decision to the Court of Appeals, Division One, which on April 17, 1995, issued an unpublished opinion affirming the trial court.[59] On May 19, 1995, Petitioner filed a petition for review with this Court, appealing the Court of Appeals decision.
This court on September 7, 1995 granted review limited to the recantation issue.

DISCUSSION

ASSIGNMENTS OF ERROR
Petitioner assigns error to the trial court entering Findings of Fact III, IV, VI, VII and VIII and the court's Conclusions of Law, all of which were affirmed by the Court of Appeals.
Appellate review of findings of fact is limited to determining whether they are supported by substantial evidence, and, if so, whether the findings support the conclusions of law and judgment.[60] We review issues of law de novo.[61]

RECANTATION
Petitioner argues T.S.' testimony was the sole evidence used to convict him, and, because she recanted her testimony, the trial court abused its discretion in denying his motion to vacate judgment on count II and his motion for new trial.
Recantation may be generally considered "newly discovered evidence." To obtain a new trial based upon newly discovered evidence, a defendant must prove that the evidence: (1) will probably change the result of the trial; (2) was discovered after the trial; (3) could not have been discovered before trial by the exercise of due diligence; (4) is material; and (5) is not merely cumulative or *1012 impeaching.[62] A new trial may be denied if any one of these factors is absent.[63]
A number of cases have developed rules for application when newly discovered evidence emerges in the nature of a recanting witness. Some Washington cases hold that when a defendant is convicted solely upon the testimony of a witness who later recants, the trial court abuses its discretion if it denies a new trial.[64] Other cases hold that when there is independent corroborating evidence supporting the prior testimony of the recanting witness, the trial court has discretion to grant or deny the new trial.[65] The corroborating evidence must be sufficient in itself to "justify a conviction and penal sentence."[66]
There was sufficient independent evidence corroborating T.S.' original testimony to support Petitioner's conviction on count II. The testimony of Ms. Nancy S. Scribner, Dr. Marshall Murrey, Ms. Kathy Marks, Dr. Mary Wedegatertnen, Ms. Margo Coad, and Detective Timothy M. Luckie, to whom T.S. made her statements about Petitioner, are consistent with her claims against Petitioner.
It is true the child's accounts of the purported sexual abuse by Petitioner contain some inconsistencies. T.S. asserted the sexual abuse happened only "once," but on different occasions she said it took place "yesterday," "two days ago," or "a month ago." She told her grandmother, Ms. Scribner, it happened in her bedroom when she was in her bed and her mother went to the store. But she told Mr. Soukup and Detective Luckie it happened in her "backyard" while she was "playing baseball" and her mother was "at a meeting." She told Ms. Margo Coad that Petitioner also sexually abused a friend named Rachel, who was with her, but she did not disclose that to anyone else.
Dr. Mary Gibbons examined T.S. and concluded the child had a history of physical and sexual abuse. But she conceded on cross-examination that her findings would support either recent sexual abuse or sexual abuse occurring several years ago. T.S.' behavioral changesextreme anger, bed-wetting, fear of men, her play with the "bop-bag"and her drawings, as she described them to her grandmother, support the child's claim that Petitioner sexually abused her.
It is for the trial court to determine whether the original testimony of a recanting witness was perjured and, if so, whether the jury's verdict was likely influenced by it.[67] Such a determination might constitute a material fact which, if newly discovered evidence, might be grounds for a new trial.[68] But the trial court in this case did not conclude the child, T.S., committed perjury in her testimony in 1991.
Recantation testimony is inherently questionable. "Recantation by an important witness of [that witness'] testimony at the trial does not necessarily, or as a matter of law, entitle the defendant to a new trial. The determination of such matters rests in the sound discretion of the trial court, and its action will not be set aside except for clear and manifest abuse.... When the trial court, after careful consideration, has rejected such testimony, or has determined ... it is of doubtful or insignificant value, its action will not lightly be set aside by an appellate court."[69]
*1013 In assessing whether T.S.' recantation was reliable, the trial court properly considered the circumstances surrounding the case, including T.S.' age, her possible reasons for recanting, relevant facts at the time of her recantation, and the passage of time between her testimony and her recantation.
The trial court recited these pertinent facts in its Findings of Fact: T.S. was only five years old at the time of trial.[70] During the trial, she lived with her grandmother, Ms. Scribner, who was an "undenied source of stability and affection" in her life.[71] Ms. Scribner was the first person she talked to about Petitioner's purported sexual abuse.[72] T.S. recanted her testimony more than fifteen months after Petitioner was convicted.[73] She stated Petitioner never touched her and she never said he did, contrary to her trial testimony.[74] At the time of her recantation, she was living with her mother, Ms. Macon [formerly Ms. Short], who did not believe T.S.' statements about Petitioner.[75] In fact, Ms. Macon [formerly Ms. Short] married Petitioner three weeks after he was sentenced in this case.[76] And T.S. refers to Petitioner as "daddy."[77] She is reported to be a very malleable child, who says what she thinks people want to hear.[78] After the trial, Ms. Macon [formerly Ms. Short] took custody of T.S. and denied the grandmother any contact with her.[79] At trial, Petitioner challenged Ms. Scribner's credibility and tried to prove the child's suggestibility, but his challenges were unsuccessful.[80] T.S.' testimony of sexual abuse by Petitioner is corroborated by the medical evidence, her drawings admitted into evidence, her behavioral changes, and her statements to different persons shortly after his purported abuse.[81]
The trial court determined T.S.' recantation was unreliable in view of the total circumstances in this case. It is not likely the recantation would have changed the outcome of the trial. There is no basis for granting a new trial.[82] Substantial evidence supports the court's findings of fact. They, in turn, support the conclusions of law and Petitioner's conviction.[83] The trial court did not abuse its discretion in denying Petitioner's motion to vacate judgment and motion for new trial.

SUMMARY AND CONCLUSIONS
To obtain a new trial based upon newly discovered evidence, a defendant must prove that the evidence: (1) will probably change the result of the trial; (2) was discovered after the trial; (3) could not have been discovered before trial by the exercise of due diligence; (4) is material; and (5) is not merely cumulative or impeaching.[84] A new trial may be denied when any one of these factors is absent.
Additional factors must be considered when newly discovered evidence is in the nature of testimonial recantation. Some cases hold that when a defendant is convicted solely upon the testimony of a witness who later recants, the trial court abuses its discretion in denying a new trial. Other cases *1014 hold that when independent corroborating evidence exists for the recanting witness' testimony, the trial court has discretion to grant or deny a new trial.
When a defendant is convicted upon the testimony of a witness who later recants, the trial court must first determine whether the recantation is reliable before considering a defendant's motion for new trial based upon the recantation. Whether there is independent corroborating evidence to support the recanting witness' original testimony is not a controlling factor. Recantations are inherently suspect and "[w]hen the trial court, after careful consideration, has rejected such testimony, or has determined that it is of doubtful or insignificant value, its action will not be lightly set aside by an appellate court."[85]
State v. Rolax supports the conclusion that when a defendant's conviction is based solely upon the testimony of a recanting witness, the trial court does not abuse its discretion if it determines the recantation is unreliable and denies the defendant's motion for new trial. But it also follows from Rolax that when a defendant's conviction is based solely upon the testimony of a recanting witness, and the trial court determines the recantation is reliable, the trial court must grant the defendant's motion for new trial.
The trial court concluded T.S.' recantation in this case was unreliable under the total circumstances, the recantation would not likely have changed the outcome of the trial, and a new trial was not warranted. With this conclusion we agree. The trial court did not abuse its discretion in denying Petitioner's motion to vacate judgment and motion for new trial. To the extent State v. Powell is inconsistent with this conclusion, we overrule it.
We affirm the decision of the Court of Appeals, Division One, which affirmed Petitioner Michael Macon's conviction of second degree child molestation (count I) and first degree rape of a child (count II) in the King County Superior Court, and a ruling by the trial court which denied his motion to vacate judgment as to count II and motion for new trial.
DURHAM, C.J., and MADSEN, DOLLIVER, ALEXANDER, GUY, TALMADGE and JOHNSON, JJ., concur.
NOTES
[1] Facts relating to Petitioner's conviction for second degree child molestation, Count I, are only mentioned briefly and are not at issue.
[2] Clerk's Papers (CP) at 3.
[3] Michelle Short married Petitioner three weeks after his sentencing in this case and is now known as Michelle Macon.
[4] Verbatim Report of Proceedings, June 6, 1991 (RPV) at 52.
[5] Ms. Scribner denied making sexual abuse allegations against Petitioner in 1988. Verbatim Report of Proceedings, June 5, 1991 (RPIV) at 80-84. Michelle Short, her daughter, also testified her mother did not make sexual abuse allegations against Petitioner in 1988. RPV at 75.
[6] CP at 1.
[7] Verbatim Report of Proceedings, June 4, 1991, at 20, 93. See RCW 9A.44.120(1). See State v. Swan, 114 Wash.2d 613, 790 P.2d 610 (1990), cert. denied, 498 U.S. 1046, 111 S.Ct. 752, 112 L.Ed.2d 772 (1991), and denial of habeus corpus aff'd, 6 F.3d 1373 (9th Cir.1993), cert. denied, ___ U.S. ___, 115 S.Ct. 479, 130 L.Ed.2d 393 (1994).
[8] RPIV at 36-37. From January 1990 to the time of trial T.S. had spent most Thursdays and the following weekends with the Scribners in Seattle because Ms. Short attended Cocaine Anonymous meetings on Thursday nights. RP V at 76, 90.
[9] RPIV at 38.
[10] Id. at 39.
[11] Id. at 68.
[12] Id. at 39-41, 68. T.S. called Michael Macon "mommy's Michael" to distinguish him from her cousin Michael. See id. at 80, 81.
[13] RPIV at 40.
[14] Id. at 41.
[15] Id. at 57. Ms. Scribner testified that in 1988 Ms. Michelle Short and Petitioner were both addicted to cocaine, resulting in the neglect of T.S. Id. at 55-57.
[16] Dr. Murrey first saw T.S. on August 29, 1990 when she was brought in by Ms. Scribner for a general checkup, or a "well child check." Dr. Murrey testified at trial that during the visit T.S. told him Petitioner physically abused her mother (Ms. Short), but did not touch her and did not touch her "privates." Verbatim Report of Proceedings, June 10, 1991 (RPVI), at 60-61. T.S. also told him she wanted to live with her grandparents or live in a foster home because she did not like doing chores at her home. Id. at 62.
[17] RPVI at 18.
[18] Id. at 17-21.
[19] RPVI at 64. Ms. Scribner testified she heard T.S. tell Dr. Murrey that "Michael put his fingers in and it hurt me." RPIV at 44.
[20] See RPIV at 102-04. Dr. Mary Gibbons, medical director of the Sexual Assault Center at Harborview at the time, was the attending physician supervising Dr. Wedergatertnen. Id.
[21] RPIV at 139.
[22] Id. at 138, 141-42.
[23] Id. at 135, 143.
[24] Dr. Mary Wedergatertnen did not testify.
[25] RPIV at 106.
[26] Id.
[27] Id. at 47, 108-11.
[28] Id. at 117.
[29] Id. at 118.
[30] RPIV at 121.
[31] Id. at 125-28.
[32] RPVI at 26-28.
[33] The record shows T.S. was again residing with the Scribners during the trial. However, in November 1991 she returned to live with her mother, Ms. Short. Ms. Short did not allow visitation or contact between T.S. and the Scribners from November 1991 until March 1993, after the Scribners petitioned for and were granted visitation rights by the court. Verbatim Report of Proceedings, March 23, 1993 (RPVIII), at 27, 32.
[34] RPIV at 53.
[35] RPIV at 63.
[36] Id. at 123.
[37] RPV at 36.
[38] Id. at 39-42. Nothing in the record supports this claim by T.S.
[39] Id. at 43.
[40] RPIV at 20-30.
[41] RPV at 124.
[42] Id. at 79.
[43] Id. at 135; RPVI at 52-53.
[44] RPV at 111-16, 120; RPVI at 53.
[45] Ms. Scribner indicated in her testimony that Petitioner physically abused Ms. Short. RPIV at 66, 67. Ms. Short testified about physical abuse early in her relationship with Petitioner, but claimed it had stopped. RPV at 54-58.
[46] D.S. was thirteen years old at the time of the reported incident.
[47] RPV at 136-60.
[48] RPVI at 3-14.
[49] Id. at 42, 45.
[50] CP at 66.
[51] Relevant portions of CrR 7.8(b)(2) and (5) provide:

"On motion and upon such terms as are just, the court may relieve a party from a final judgment, order, or proceeding for the following reasons:
"....
"(2) Newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under rule 7.6;
"....
"(5) Any other reason justifying relief from the operation of the judgment."
[52] The record does not indicate whether the cousins Michael and Dominique lived with T.S., Ms. Macon and Petitioner in 1990.
[53] RPVIII at 8.
[54] RPVIII at 11.
[55] RPVIII at 12.
[56] RPVIII at 21, 25.
[57] RPVIII at 33.
[58] Id.
[59] State v. Michael Macon, No. 29339-7-I (Division One Apr. 17, 1995).
[60] City of Tacoma v. State, 117 Wash.2d 348, 361, 816 P.2d 7 (1991) (citing Morgan v. Prudential Ins. Co. of Am., 86 Wash.2d 432, 437, 545 P.2d 1193 (1976)).
[61] State v. Ford, 125 Wash.2d 919, 923, 891 P.2d 712 (1995).
[62] State v. Swan, 114 Wash.2d. 613, 790 P.2d 610; State v. Williams, 96 Wash.2d 215, 223, 634 P.2d 868 (1981).
[63] Williams, 96 Wash.2d at 223, 634 P.2d 868.
[64] State v. Rolax, 84 Wash.2d 836, 838, 529 P.2d 1078 (1974), overruled on other grounds in Wright v. Morris, 85 Wash.2d 899, 540 P.2d 893 (1975); State v. Powell, 51 Wash. 372, 374-75, 98 P. 741 (1909); State v. Landon, 69 Wash.App. 83, 90, 848 P.2d 724 (1993); State v. York, 41 Wash.App. 538, 543, 704 P.2d 1252 (1985). See State v. D.T.M., 78 Wash.App. 216, 220-21, 896 P.2d 108 (1995).
[65] State v. Rhinehart, 70 Wash.2d 649, 652, 424 P.2d 906, cert. denied, 389 U.S. 832, 88 S.Ct. 102, 19 L.Ed.2d 92 (1967); State v. Wynn, 178 Wash. 287, 288-90, 34 P.2d 900 (1934). See also State v. Shaffer, 72 Wash.2d 630, 635, 434 P.2d 591 (1967).
[66] Powell, 51 Wash. at 374, 98 P. 741.
[67] Rolax, 84 Wash.2d at 838, 529 P.2d 1078.
[68] Id.
[69] Wynn, 178 Wash. at 288-89, 34 P.2d 900.
[70] CP at 106.
[71] CP at 106.
[72] Id.
[73] Id. at 105-06.
[74] Id. at 107.
[75] Id. at 106.
[76] Id. at 107.
[77] Id.
[78] Id.
[79] Id. at 106.
[80] Id. at 107.
[81] Id. at 108.
[82] Petitioner does not prove the first of the five factors required for granting a new trial on the basis of newly discovered evidence, that is "(1) the evidence will probably change the result of the trial." Since absence of any one of these factors is sufficient to deny a motion for new trial, discussion of the other four factors is unnecessary.
[83] See City of Tacoma v. State, 117 Wash.2d at 361, 816 P.2d 7.
[84] Swan, 114 Wash.2d at 641-42, 790 P.2d 610; State v. Williams, 96 Wash.2d 215, 223, 634 P.2d 868 (1981).
[85] Wynn, 178 Wash. at 289, 34 P.2d 900.