# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 76737-2-I |
| Appellant, | ) | |
| | ) | DIVISION ONE |
| v. | ) | |
| | ) | UNPUBLISHED OPINION |
| DONALD HOWARD MCELFISH, | ) | |
| | ) | |
| Respondent. | ) | FILED: August 7, 2017 |

TRICKEY, A.C.J. — The State appeals the trial court's order granting Donald McElfish's motion for a new trial on the basis of newly discovered evidence. The court granted the motion after a hearing to test the reliability of the complaining witness's alleged recantation of her accusation. We conclude there is insufficient evidence to support three of the trial court's findings of fact from that hearing. Because the trial court relied on those unsupported findings when it granted the defendant's motion, its decision was based on untenable reasons. Accordingly, the trial court abused its discretion. We reverse.

## FACTS

In March 2014, Donald McElfish was convicted in a jury trial of attempted rape in the second degree, kidnapping in the first degree, and assault in the second degree - intent to commit a felony with sexual motivation for his role in an attack on C.M. in October 2012.

At the original trial, C.M. testified to the following events. On October 5, 2012, C.M. was at a friend's house in Woodland, Washington. She ran into Brandt Jensen, who was staying there, in the entryway of the house. Jensen was angry with C.M. because he believed that she had or had stolen his bag. Jensen grabbed

her by the arm and marched her from the main house down to the garage/shop to see McElfish. Ron Easley, who had also been in the entryway, accompanied them.

When they arrived at the garage/shop, Jensen started screaming at McElfish, who was sleeping there. Jensen told McElfish that C.M. had to pay for stealing his bag. Jensen tried to make C.M. admit to stealing the bag, but she would not.

When C.M. continued to deny taking the bag, Jensen hit her twice in the face. Jensen told her to "get naked, get [her] clothes off and sit in the chair."[1] He hit her again, intimidated her with a gun, and "got crazy," so she complied.[2] Jensen also pulled a knife out around that same time.

Jensen told her that she was going to have to have sex with them, and possibly a dog, as "pay back."[3] In the process of using the knife to cut the duct tape, Jensen cut his finger. Jensen and Easley went back upstairs to the main house to clean up Jensen's wound.

McElfish asked C.M. something about whether they should "get it done before [Jensen and Easley came] back down."[4] Then C.M. reminded McElfish that he had once told her he would never have "sex or something" with someone who "didn't want it."[5] So, McElfish stopped. While C.M. was still taped to the chair, McElfish touched her breast and touched or tried to touch her vagina.

C.M. managed to get loose from the duct tape. She tried to cover herself

---

[1] Report of Proceedings (RP) (Mar. 12, 2014) at 24.
[2] RP (Mar. 12, 2014) at 24-25.
[3] RP (Mar. 12, 2014) at 33-34.
[4] RP (Mar. 12, 2014) at 35.
[5] RP (Mar. 12, 2014) at 35.

with a shirt that was in the room, but McElfish yanked it out of her hands and told her it was his shirt. Tabitha Gaylor came to check on C.M., but McElfish "got mad" and told Gaylor to go away.[6] C.M. screamed to Gaylor for help.

In the room, there was a small window above a computer desk. C.M. tried to get out through the window, but McElfish "freaked out about his computer" and tried to pull her back down.[7] McElfish went to the sliding glass doors and yelled for Jensen and Easley to come back. C.M. ran out a back door and got away. McElfish tried to grab her but was unsuccessful.

In April 2015, McElfish filed a motion for a new trial or hearing on the basis of newly discovered evidence, an affidavit by C.M. that significantly recanted her trial testimony. In the affidavit, C.M. explicitly apologized for having given false testimony incriminating McElfish at trial. She explained that McElfish had not been involved in the attack and had actually helped her escape, by convincing Jensen and Easley to leave the room and then, as soon as they were far enough away, telling C.M. to run away out the other door. She credited McElfish with saving her life.

The trial court held an evidentiary hearing so that C.M. could answer questions about her affidavit and her earlier testimony. At the hearing, C.M. acknowledged that she had signed the affidavit in front of a notary but explained that someone else had typed the affidavit. She stated that some of the things in the affidavit were not true, including that McElfish had helped her escape. She said that she was scared when she signed the affidavit and was not feeling well.

---

[6] RP (Mar. 12, 2014) at 42.
[7] RP (Mar. 12, 2014) at 43.

3

The State and McElfish also asked C.M. about the events on October 5, 2012. C.M.'s account of the attack was largely similar to her original trial testimony. However, at several points, C.M. was unable to remember details about McElfish's actions.

The trial court concluded that C.M.'s testimony at the hearing, "and in part the affidavit," constituted a recantation of her trial testimony.[8] The trial court granted McElfish's motion for a new trial.

## ANALYSIS

The State argues that the trial court abused its discretion because it based its decision on unsupported findings of fact. Specifically, the State argues that substantial evidence did not support the trial court's findings that C.M. testified at trial that McElfish had touched her vagina, that C.M. testified at the hearing that the affidavit was half correct, that C.M.'s testimony at the hearing was inconsistent with her trial testimony, and that there was no evidence corroborating C.M.'s trial testimony.[9] We conclude that some of these findings are not supported by substantial evidence, thus, the trial court based its decision on untenable grounds.

The trial court may order a new trial on the basis of newly discovered evidence. CrR 7.8(b)(2). But the court should not order a new trial "unless the moving party demonstrates that the evidence (1) will probably change the result of

---

[8] Clerk's Papers (CP) at 36.
[9] The State also assigns error to the trial court's finding that the evidence of C.M.'s recantation was newly discovered and could not have been discovered prior to trial by exerting due diligence. Br. of Appellant at 1. The State waives that assignment of error by failing to support it with argument, and, in any event, appears to concede that the evidence could not have been discovered prior to trial. Br. of Appellant at 23; Cowiche Canyon Conservancy v. Bosley, 118 Wn.2d 801, 808-09, 828 P.2d 549 (1992).

the trial; (2) was discovered since the trial; (3) could not have been discovered before trial by the exercise of due diligence; (4) is material; and (5) is not merely cumulative or impeaching." State v. Williams, 96 Wn.2d 215, 223, 634 P.2d 868 (1981) (emphasis omitted).

We review a trial court's decision to grant a new trial for an abuse of discretion. State v. Ieng, 87 Wn. App. 873, 877, 942 P.2d 1091 (1997). "A trial court abuses its discretion only when its decision is manifestly unreasonable or based on untenable grounds." In re Marriage of Fiorito, 112 Wn. App. 657, 663-64, 50 P.3d 298 (2002). A trial court's decision is based on untenable grounds when its findings of fact are not supported by the record. Fiorito, 112 Wn. App. at 664.

Appellate review of the trial court's findings of fact is limited to whether they are supported by substantial evidence. State v. Macon, 128 Wn.2d 784, 799, 911 P.2d 1004 (1996). Substantial evidence exists "'if it is sufficient to persuade a fair-minded, rational person of the truth of the declared premise.'" Lodis v. Corbis Holdings, Inc., 192 Wn. App. 30, 61, 366 P.3d 1246 (2015) (quoting Brown v. Superior Underwriters, 30 Wn. App. 303, 306, 632 P.2d 887 (1980), review denied, 185 Wn.2d 1038, 377 P.3d 744 (2016)).

We address each of the trial court's challenged findings of fact in turn.

*Finding of Fact No. 2*

At the trial, the alleged victim [C.M.] testified that Brandt Jensen and Ronald Easley took her from the main residence of the home she was visiting to a nearby shop where the defendant resided. She testified that in the defendant['s] residence she was assaulted by Jensen, forced to disrobe and was tied to a chair with duct tape. She testified that the defendant did not participate in these acts. She

5

testified that while she was restrained, the defendant touched her breasts and vagina.[10]

The State argues that the trial court's second finding of fact is not supported by substantial evidence because C.M. never testified at trial that McElfish had touched her vagina. We disagree.

At trial, after C.M. testified that McElfish had touched her breast, the State asked her about what other physical contact she had with McElfish:

[State:] Okay. Did he try and touch you anywhere else on your body?

[C.M.:] I do remember something about, I don't know, I don't want to talk about it.

[State:] I know you don't want to talk about it. I need you to talk about it.

[C.M.:] Well, God, well, you know, that area.

[State:] What do you call that area?

[C.M.:] I don't think he really -- he just was --

[State:] No, what do we call that area?

[C.M.:] Oh, gosh. Do I have to say it? Privates.

[State:] Okay. Is it your vagina?

[C.M.:] Yeah, gosh darn it.

[State:] Did he try and touch your vagina?

[C.M.:] Just a little -- barely.

[State:] Okay. Did he actually touch your vagina?

[C.M.:] I can't really put my finger on that because that's just a --

[State:] Did he try?

---

10 CP at 35.

[C.M.:] Yeah.

[State:] Okay.

[C.M.:] He might have.[11]

It is clear that C.M. testified that McElfish at least tried to touch her vagina. But a rational and fair-minded person could also believe that C.M.'s equivocal and halting responses to whether McElfish actually touched her vagina, followed by her final statement that McElfish "might have," was testimony that McElfish did actually touch her vagina. Therefore, we will not disturb this finding of fact.

*Finding of Fact No. 6*

At the hearing on May 10[,] [C.M.] testified she was aware of the contents of the affidavit and that half of the affidavit was incorrect and that half of it was correct.[12]

The State argues that while there is evidence that C.M. agreed with some of her statements in the affidavit and disavowed some of the other statements, there was no evidence of what portion of the affidavit she believed was correct. We agree.

C.M. testified at the hearing that the affidavit was "a lot wrong."[13] No one asked C.M. to estimate what portion of the affidavit she currently agreed with at the hearing. C.M. agreed with several specific statements identified by McElfish's counsel. But C.M.'s hearing testimony contradicted at least half of the material facts in the affidavit, including when McElfish woke up, McElfish's role in encouraging Jensen and Easley to leave the room, what McElfish said to her when

---

[11] RP (Mar. 12, 2014) at 38-39.
[12] CP at 36.
[13] RP (May 10, 2016) at 47.

7

they were alone in the room, and whether he helped or hindered her escape.[14]

Because C.M.'s testimony flatly contradicted the majority of the affidavit, she said

the affidavit was "a lot wrong," and agreed with only a few, specific statements,

there is no support for the trial court's finding that C.M. testified that half of the

affidavit was correct.

*Finding of Fact No. 8*

> Inconsistent with her testimony at trial, while stating that Mr. McElfish touched her breast, she testified that Mr. McElfish did not touch her in a sexual manner. She denied that he touched her vagina and added that at the time of this incident, the defendant appeared to be scared of Jensen. The court finds this testimony to be reliable.[15]

The State argues that this finding of fact is not supported by substantial

evidence because C.M.'s hearing testimony was consistent with her trial testimony

since C.M. did not testify that McElfish did not touch her in a sexual manner and

C.M. did not deny that McElfish touched her vagina. We agree.

At the hearing, C.M. struggled with testifying about McElfish's actions, just

as she had done at the trial. When McElfish's counsel asked if McElfish had done

"anything sexual" to her, C.M. responded, "Well, not really," but added that

McElfish had "tried."[16]

The State asked C.M. whether McElfish had touched her breast, and she

replied that he had. Afterward, McElfish's counsel asked for more details about

McElfish touching her breast. C.M. rejected McElfish's counsel's suggestion that

---

[14] C.M.'s hearing testimony also contradicted portions of the affidavit that are not material to McElfish's actions. For example, contrary to her testimony at the hearing, C.M. stated in her affidavit that Jensen had drawn the gun in the main house and threatened to kill anyone who tried to stop him.
[15] CP at 36.
[16] RP (May 10, 2016) at 29-30.

McElfish had touched her breast when he was giving her something to drink. McElfish's counsel also asked if there was anything she could "point to, to show that any touching was sexual in nature."[17] C.M. said she could not, but it "must've been something."[18]

> The State also asked about any other times McElfish had tried to touch her.
>
> [State:] Did he try to touch you in any other way, besides the touching of your breast?
>
> [C.M.:] No, but he -- when I grabbed his shirt to cover my body with it he said, "Give me my shirt," and grabbed it back from me, and that shocked me, too, because he's always been my friend before that and I figured he, at least, would say something to the guys like "calm down," you know, to Brandt, because Brandt would usually listen to him.
>
> [State:] Now, during the trial, at the original trial, you testified that you remembered something about him trying to touch you anywhere else on your body and you said on your privates – your private area.
>
> [C.M.:] I don't remember that, I don't --
>
> [State:] Okay.
>
> [C.M.:] I mean, I -- I might have blanked -- blacked it out, or something.[19]

C.M.'s testimony establishes that two of the facts embedded in this finding are incorrect. First, C.M. never testified that McElfish did not touch her in a sexual manner. While C.M. could not point to any evidence to show that McElfish did touch her in a sexual manner, she disagreed with McElfish's counsel's attempts to provide non-sexual explanations for McElfish's touching of her breast.

Second, C.M. did not deny that McElfish touched her vagina. The only time

---

[17] RP (May 10, 2016) at 46.
[18] RP (May 10, 2016) at 46.
[19] RP (May 10, 2016) at 39-40.

anyone asked C.M. specifically about McElfish touching her vagina, or near it, she said she did not remember it happening but immediately clarified that she might have blacked out the memory. While she did not testify that McElfish touched her vagina, she also did not deny that McElfish touched her vagina.

McElfish argues that C.M.'s negative response to the State's question whether McElfish had touched her in any way beside her breast, is the same as denying that McElfish touched her vagina. We disagree. The State's next question gave C.M. an opportunity to deny that this specific act occurred, but she did not. She merely said she did not remember it happening. A rational, fair-minded person would not take C.M.'s responses to those two questions as her affirmatively denying that McElfish touched or tried to touch her vagina.

Accordingly, we conclude that this finding is, in part, not supported by substantial evidence.

*Finding of Fact No. 9*

There was no direct evidence at trial that corroborated the claims made by [C.M.][20]

The State argues that this finding of fact is not supported by substantial evidence because witnesses testified about how C.M. had described the attack right after the incident and Gaylor's testimony at trial corroborated some of C.M.'s account. McElfish argues that the finding is supported by substantial evidence because C.M. was the sole source of information about what had happened while C.M. was in the room alone with McElfish. We agree with the State.

Here, there was some evidence produced at trial that corroborated C.M.'s

---

[20] CP at 36.

account. At trial, C.M. testified that Gaylor had come to check on her, and C.M. screamed to her for help. In response, McElfish had "got[ten] mad" and "told her to go away or whatever, go away."[21] Similarly, Gaylor testified that at trial, on October 5, 2012, she saw Jensen and C.M. walk down to the garage/shop. Later that day, she spoke to Jensen. Something that Jensen said made her want to talk to McElfish. When Gaylor knocked on the door, McElfish asked who it was. After she identified herself, McElfish told her he was busy, in an agitated tone. As Gaylor walked away, she heard C.M. scream her name, sounding scared.

Deputy Jason Hammer testified that C.M. told him that McElfish had "grabbed her breasts, grabbed her body and attempted to grab her vagina."[22] Deputy Hammer also testified that C.M. told him that she escaped when McElfish tried to get Jensen's attention.

McElfish argues that Deputy Hammer's testimony is not direct evidence.[23] We disagree. A witness's statements to other people, if admitted at trial, may be independent corroboration of her trial testimony, even if she later recants her trial testimony. See Macon, 128 Wn.2d at 800. In Macon, the court concluded that a young victim's earlier reports of sexual abuse to others, which had been introduced at trial, were independent corroboration of her trial testimony—even after she recanted. Macon, 128 Wn.2d at 800-01. Deputy Hammer testified about what C.M. said happened. His testimony provides direct evidence of what happened in

---

[21] RP (Mar. 12, 2014) at 42.
[22] RP (Mar. 13, 2014) at 15.
[23] Merla Paul, whose house C.M. broke into to hide from Jensen, also testified. She testified about discovering C.M. at her house and what C.M. had told her about the attack, but did not relate anything C.M. said about McElfish's specific acts.

11

the room with McElfish, not circumstantial evidence.

In short, the trial court's finding that there was *"no direct evidence"* is too broad.[24] Gaylor and Deputy Hammer offered some direct evidence corroborating C.M.'s claims. Thus, this finding of fact is not supported by substantial evidence.

In conclusion, the trial court's sixth, eighth, and ninth findings of fact were, at least in part, not based on substantial evidence. Because the trial court relied on these findings of fact when it decided whether to grant McElfish's motion for a new trial, its decision was based on untenable grounds. Accordingly, the trial court abused its discretion by granting the motion.

We reverse the trial court's order and remand for a determination based only on findings that are supported by substantial evidence.

Trickey, A.C.J.

WE CONCUR:

_____

_____

2017 AUG -7 AM 10: 39

COURT OF APPEALS DIV I
STATE OF WASHINGTON

---

[24] CP at 36 (emphasis added).