[No. 36846-3-II.   Division Two.   May 27, 2009.]

THE STATE OF WASHINGTON, *Respondent*, v. RICHARD ROY
SCOTT, *Appellant*.

*Dana M. Lind* (of *Nielsen, Broman & Koch, PLLC*), for appellant.

*David J. Burke, Prosecuting Attorney*, for respondent.

¶1 Hunt, J. — Richard Roy Scott appeals the superior court's denial of his motion to withdraw his third-degree child-rape *Alford*[1] plea. He argues that the court erred (1) in denying his motion as untimely, and (2) in failing to conduct an evidentiary hearing to determine the credibility of recent recantations by the alleged victim and two witnesses. We vacate the superior court's order denying Scott's motion and remand for a reference hearing to determine the credibility of Scott's "new evidence."

## FACTS

### I. *Alford* Plea and Sentencing

¶2 In 2001, the State charged Richard Roy Scott with one count of third degree rape of a child, alleging that Scott had sexual intercourse with DH, who was under the age of 16, sometime between February 1, 2001, and March 31, 2001. The Pacific County prosecutor filed an affidavit of probable cause on May 11, 2001, outlining the State's evidence supporting the charge.

¶3 On May 25, 2001, Scott entered an *Alford* plea. Scott explained that he was pleading guilty because he did not "see a chance of winning."[2] In his statement on plea of guilty, he did not check the box allowing the trial court to review the police reports or probable cause affidavit to provide a factual basis for his plea. Nowhere else in his

---

[1] *North Carolina v. Alford*, 400 U.S. 25, 91 S. Ct. 160, 27 L. Ed. 2d 162 (1970).

[2] The verbatim report of the proceedings contains no recitation of facts supporting the plea.

statement on plea of guilty did he mention or incorporate by reference the prosecutor's affidavit of probable cause.[3] In the blank asking Scott to describe in his owns words why he was guilty, Scott wrote only the words "Alford plea."

¶4 In exchange for Scott's pleading guilty, the State agreed to "terminate investigation of [Scott] and not file additional charges." The plea agreement identified Scott's offender score as one, yielding a standard range of 15 to 20 months' confinement. The State agreed to recommend the high end of that standard sentencing range.

¶5 In its presentence investigation report, the State summarized DH's and Connie DuFour's statements, and an interview with Scott, in which he stated that (1) DH and his parents told Scott that DH was 18 years old; (2) he (Scott) had sex with DH at DH's request when DH stayed overnight night at Scott's house; and (3) the next morning, DuFour and a juvenile male had come into the house and observed DH and Scott dressing. At the end of the interview, "Scott stated that 'he (the victim [DH]) wasn't that good anyway' [and] laughed excessively regarding this comment." Clerk's Papers (CP) at 20.

¶6 At the July 6 sentencing hearing, Scott asked the court to consider him for the Special Sex Offender Treatment Program (SSOSA) under former RCW 9.94A.120

---

[3] The prosecutor's probable cause affidavit described several statements that DH made during an interview with a Child Protective Services social worker, including: (1) "[S]ince approximately April 2000, until recently, Richard Scott had been having anal, oral, and digital sex with D.H."; (2) "in the past five to six months [DH] and Scott had engaged in sexual activity approximately 100 times"; (3) Scott made DH engage in sexual activity with Scott "every time [DH] spent the night at Scott's house"; (4) DH spent the night there about one out of every three nights; (5) the sex included "oral sex and anal sex, including Scott performing anal sex on D.H."; and (6) Scott threatened DH " 'every once in a while.' " Clerk's Papers (CP) at 143-44.

The affidavit also described the following statements made by Connie DuFour, who had supposedly witnessed the alleged sexual activity between Scott and DH: (1) "[A]t the end of February, 2001, or the beginning of March, 2001, she [DuFour] and J.F. [Johan Fernlund] entered Richard Scott's residence and saw him engaging in anal sex with D.H."; and (2) "the reason she [DuFour] did not tell officers sooner about [the rape] is because she told her father and he told her not to become involved, and after that she was gone for about nine weeks for medical treatment." CP at 144-45.

(2001) (which required an admission of guilt). Scott reiter-
ated that he thought DH was 18 when DH rented a room
from him (Scott). Scott stated that he did not allow DH to
move in until after DH's 18th birthday in March,[4] and after
DH moved in, they had sex "about three" times over a
period of "about three weeks."

¶7 The sentencing court questioned community correc-
tions officer Robert Bromps, the presentence investigation
report preparer, about recent unsuccessful attempts to
contact DH. Bromps explained that (1) a letter he had sent
to DH's last known address had been returned; (2) the
telephone number he had for DH was not working; and (3)
he (Bromps) knew of no way "of getting a hold of" DH. Scott
told the trial court that DH's family had been "evicted twice
in the last three months," that "they probably left the
state," and that the family was from Montana.

¶8 By the time of sentencing, the State had determined
that Scott's actual offender score was three, not one, yield-
ing a standard sentencing range of 26 to 34 months'
confinement. His prior convictions also made him ineligible
for a SSOSA. Accordingly, the court sentenced him to 34
months' confinement, plus 36 to 48 months' community
custody. The court also ordered Scott to have no contact
with DH.

II. 2003 PERSONAL RESTRAINT PETITION AND REMAND

¶9 In 2003, Scott filed a personal restraint petition,
arguing that his guilty plea was invalid because his of-
fender score had been miscalculated. The Supreme Court
ordered the superior court to grant Scott his choice of
remedy—withdrawal of his guilty plea or specific perfor-
mance of the plea agreement, unless the superior court
determined after an evidentiary hearing that there were
compelling reasons not to allow the remedy Scott chose.

---

[4] DH's actual birthday was April 12, 1985, which would have made him only 15
years old at the time of the alleged incidents.

¶10 Thereafter, Scott wrote a letter to the Pacific County prosecutor, offering to "withdraw the right to change [his] plea" in order to save the State money.[5] Thus, Scott did not withdraw his 2001 *Alford* plea and, instead, left it intact to serve as the basis for his resentencing. On May 16, 2003, in accordance with the original 2001 plea agreement, the superior court sentenced Scott to 20 months' confinement, followed by 36 to 48 months' community custody (with the total confinement and community custody not to exceed the statutory maximum of 60 months).

¶11 At that point, Scott had already served 24 months in prison and, apparently, expected to be released to community custody. On May 19, 2003, however, the King County Prosecutor's Office petitioned to have Scott civilly committed as a sexually violent predator (SVP) under chapter 71.09 RCW. The record on appeal does not show Scott's current custody status.[6]

### III. NEWLY DISCOVERED EVIDENCE; MOTION TO VACATE PLEA

¶12 More than two years later, on October 7, 2005, Scott's counsel, Michael Turner, moved to withdraw. Scott opposed this motion, arguing that Turner should be investigating his (Scott's) assertion that he had found DH and that DH had been 18 years old at the time of the alleged rape. The court granted Turner's motion to withdraw.

¶13 In April 2006, Scott filed a pro se motion asking the superior court to vacate his *Alford*-plea conviction, to appoint an attorney to represent him, and to hear oral argument on his motion. On May 31, with the assistance of standby counsel, Scott supplemented his motion to vacate with two supporting declarations, one from DH and the other from DH's mother.

---

[5] Scott wrote this letter himself, apparently without the assistance of counsel.

[6] Nor does the record on appeal show the status of King County's SVP petition.

## A. "Victim's" Recantation

¶14 DH declared that (1) he had never entered Scott's house; (2) Scott had never forced him to engage in sexual activity; (3) he was aware that Scott had been charged with third degree rape of a child and that he (DH) was the alleged victim; (4) the charge was false because he (DH) had been arrested in February 2001 and incarcerated in Montana from February to May 2001;[7] and (5) he remembered having been interviewed by police and having "told them distinctly at this time that nothing had happened between Mr. Scott and myself." CP at 76. DH's mother declared that DH had been incarcerated in Great Falls, Montana, from February to May 2001.

¶15 In March 2007, represented by new appointed counsel, Scott filed a memorandum in support of his motion to vacate his guilty plea. He outlined and attached as "new evidence" a transcript of a May 11, 2006 interview between DH and a private investigator in which DH stated that Scott never made any sexual advances toward him and that he (DH) had never been in Scott's house.

## B. Other New Evidence

¶16 Scott's counsel also submitted the following new evidence in support of Scott's motion to vacate his plea: (1) excerpts from the King County Prosecuting Attorney's Office's September 8, 2006 interview of Fernlund; (2) a 2001 statement by Carolyn Yellowhawk,[8] which the State allegedly never gave to Scott's trial counsel; and (3) affidavits and declarations indicating that some of the people who had

---

[7] On August 15, 2007, during an interview with a private investigator, DH stated that he had been living in Idaho with his grandparents during this same period. During that interview, he again denied having engaged in sexual activity with Scott.

[8] Yellowhawk was DH's school counselor, with whom DuFour had spoken in 2001 about the alleged rape.

reported Scott's allegedly illegal sexual activity to the police subsequently took over his lawn care business (without his permission) after he went to jail. At the time Scott submitted this memorandum, he believed that DuFour was deceased.

¶17 During the 2007 interview with the King County investigator, Fernlund stated that (1) his mother said that "the cops" had told her that Scott was a child molester; (2) he (Fernlund) had never "seen" Scott "with any kids"; (3) he (Fernlund) "just said what everybody else was sayin' and like went in there essentially said the same thing" during the 2001 interview with police, CP at 337; and (4) "[l]ike all of us were like all right since he's a queer you know, do whatever. So I guess we all just like . . . I don't know kind a [sic] put together to get him locked up." CP at 336-39. In a separate interview, Fernlund told Scott's private investigator that he (Fernlund) never saw Scott engaged in sex with DH and he never observed Scott engaged in any kind of sex act with anyone during the time he (Fernlund) had known him (Scott).

¶18 On May 1, Scott submitted a second supplemental memorandum with additional "new evidence"—the transcript of King County's recent interview with DuFour, who was still alive and had been found. In her 2007 interview, DuFour stated that, on the day she had observed Scott having sex with DH, (1) she had gone into the house alone while her father[9] waited outside in his vehicle; (2) when she saw Scott having sex with DH, she had retrieved a camera from her vehicle and had taken two photos of Scott and DH, which she gave to the police; (3) her father told her to go to the police and she went with her father to the police "that night" and "again the next day"; and (4) the police had

---

[9] The record does not identify the name of DuFour's father. It appears, however, that DuFour was referring to someone other than Fernlund, whom she had identified in her 2001 statement as having been with her when she observed Scott.

arrested Scott "just a couple days" after she reported the incident.[10]

## C. Motion To Vacate Plea

¶19 On May 11, the superior court heard oral argument on Scott's motion to vacate his guilty plea. Scott argued that he had been diligent in his investigation of the case, and that the newly discovered evidence (specifically the recent statements of DH, Fernlund, and DuFour) showed that Scott was innocent. The State argued that (1) "this [was] a case about equitable estoppel and finality of judgments"; (2) Scott should have either not entered an *Alford* plea in 2001 or chosen to withdraw his plea in 2003, when he had the chance following the Supreme Court's remand; (3) Scott had not been diligent because he had done nothing between 2003 and 2005; (4) Scott had received the benefit of his plea bargain because the State had stopped investigating other potential charges against him; and (5) the new evidence was unreliable because it conflicted with Scott's own statements in 2001.

¶20 The superior court did not hold an evidentiary hearing to determine whether the new statements were credible. Instead, in a June memorandum opinion, the superior court adopted the State's reasoning and denied Scott's motion to vacate. With regard to Scott's new evidence, the court stated:

> The facts presented to the Court regarding key witnesses changing or recanting their testimony is not sufficient to overcome [Scott's] intelligent, knowing and voluntary Alford plea. [Scott] was represented by counsel each step of the legal process. [Scott] presented no evidence that he did not understand that he was making a "deal" with the prosecutor.

---

[10] In contrast with DuFour's 2007 interview, the State's 2001 probable cause affidavit (1) represented DuFour's having stated in 2001 that Fernlund had been with her when she observed Scott and DH having sex; (2) did not mention any photos that DuFour had taken and allegedly given to the police; and (3) indicated that DuFour did not tell the police immediately about her alleged observations because her father had "told her not to become involved, and after that she was gone for about nine weeks for medical treatment."

. . . .

The newly discovered evidence enumerated in [Scott's] briefs is not unique or compelling to justify vacation of his sentence. Often complaining witnesses change their testimony at a later date for a variety of reasons. [Scott] has failed to demonstrate that the complaining witnesses' statements at the time they were made were untrue. Instead, [Scott] chose not to proceed to a jury trial to flesh out all the various witnesses' testimonies in 2001.

. . . .

The Court further agrees with the State that Mr. Scott's motion to vacate is untimely [because Scott] failed to adequately demonstrate why he waited so long to vacate his May 16, 2003 judgment, or, for that matter, his 2001 judgment.

CP at 96-98.

¶21 Scott appeals.

## ANALYSIS

¶22 Scott argues that the superior court erred by denying his motion to vacate his *Alford* plea without first holding an evidentiary hearing to determine the credibility of the new evidence—victim and witness recantations. The State counters that that the superior court properly denied Scott's motion because it was time barred. We agree with Scott.

### I. Standard of Review

¶23 We review for abuse of discretion the superior court's decision denying vacation of a judgment and a new trial. *State v. Ieng*, 87 Wn. App. 873, 877, 942 P.2d 1091 (1997), *review denied*, 134 Wn.2d 1014 (1998). The superior court abuses its discretion when its decision is manifestly unreasonable, based on untenable grounds, or based on untenable reasons. *State v. Downing*, 151 Wn.2d 265, 272, 87 P.3d 1169 (2004).

## II. Motion Not Time Barred

¶24 Scott argues that his motion was not time barred. The State argues that Scott should not be allowed to withdraw his guilty plea because he did not act with reasonable diligence in discovering the "new" evidence or in filing his motion to vacate based on new evidence. We disagree with the State.

¶25 Criminal Rule (CrR) 7.8(b)(2) provides that "the court may relieve a party from final judgment" based on "[n]ewly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under rule 7.5."[11] In general, where the motion is based on newly discovered evidence, the defendant must bring the motion within a reasonable time and within one year after the judgment, order, or proceedings. CrR 7.8. But, where the motion is a collateral attack, such as a motion to withdraw a guilty plea, the one-year time limit does not bar the motion if the defendant acted with reasonable diligence in discovering the new evidence. RCW 10.73.090, .100.

¶26 Scott argues that he could not reasonably have discovered this new evidence earlier because a no-contact order prohibited him from contacting DH. Scott emphasizes that the State similarly had no means to locate DH, one of the grounds the State asserted as a hardship if the superior court allowed Scott to withdraw his plea. The State makes this same assertion here: "The State in 2003 did not know the whereabouts of key witnesses and likely would have had trouble tracking them down."[12] Br. of Resp't at 27.

---

[11] CrR 7.5(b) provides that a motion for a new trial must be served and filed within 10 days after the verdict or decision. In 2001, when Scott allegedly committed his crimes, this provision was contained in former CrR 7.6(b) (2001). Accordingly, former CrR 7.8(b)(2) (2001) referenced CrR 7.6 instead of CrR 7.5.

[12] The State also argues that Scott should not be allowed a "third bite of the apple" because he elected not to withdraw his plea on remand from the Supreme Court in 2003 when he had the chance. But when Scott elected to be resentenced on his original *Alford* plea with the same plea agreement, rather than withdraw his plea, he had already served 24 months of a 20-month sentence. Consequently,

¶27 We note the State's similar inability to stay in contact with DH in 2001 at the time of Scott's sentencing. Yet the State argues that Scott, who was in prison and prevented by court order from contacting the victim, somehow could have discovered this new evidence earlier if he had "made a timelier request to have a new lawyer appointed to investigate any the [sic] possibility of witness 'recantations.'" Br. of Resp't at 28. Scott replies that he made such a request in 2005 when he opposed his attorney's notice of intent to withdraw and moved to vacate his plea based on new evidence.

¶28 It appears from the prosecutor's 2001 probable cause affidavit that the witness statements leading up to Scott's *Alford* plea were consistent. DH claimed that he and Scott had "engaged in sexual activity approximately 100 times." Both DuFour and Fernlund claimed to have witnessed Scott having sex with DH. More recently, Fernlund described the witnesses' attitudes at the time they gave their statements to the police as follows: "Like all of us were like all right since he's a queer you know, do whatever. *So I guess we all just like . . . I don't know kind a* [sic] *put together to get him locked up.*" CP at 339 (emphasis added). Thus, it is unlikely that these witnesses would have changed their stories earlier or that Scott could have done anything to cause these changes.[13]

¶29 We hold, therefore, the general CrR 7.8 and RCW 10.73.090 one-year time limits do not bar Scott's motion to

---

it was reasonable for him to believe that when he was resentenced to 20 months' confinement, he would be deemed to have served his full sentence and would be released immediately from confinement. Instead, the State initiated civil SVP commitment proceedings.

The State also argues that fundamental fairness requires that it receive the benefit of its 2001 plea bargain with Scott, in which the State gave up the right to investigate additional charges that it would not now be able to pursue. Contrary to the State's assertion, it appears that the State would be able to pursue these additional charges because the State now knows the location of each of these witnesses, whom the State or Scott's investigators have recently found and who have recently given new statements.

[13] A defendant cannot precipitate a witness's recantation, especially where the recanting witness's statements are consistent through pretrial investigations and proceedings. *State v. D.T.M.*, 78 Wn. App. 216, 221, 896 P.2d 108 (1995).

vacate his guilty plea, based on new evidence that he acted with reasonable diligence in discovering and could not reasonably have discovered at an earlier time. RCW 10.73.100.

### III. Evidentiary Hearing To Determine Reliability of New Evidence

¶30 Scott asks us to remand to the superior court to conduct an evidentiary hearing to determine whether the witnesses' recantations are credible and, thus, entitle him to a new trial. He argues that the superior court erred by rejecting his new evidence without first holding an evidentiary hearing to determine whether the recanting witnesses' statements were reliable because, if true, DH's, DuFour's, and Fernlund's recent statements prove that Scott did not commit the crime for which he entered an *Alford* plea, based on their earlier statements to the contrary. These witnesses recently declared either that (1) Scott did not have sex with DH; or (2) Scott had sex with DH, but only after DH had turned 16 years old, the age of consent.[14] We agree.

---

[14] The State argues that (1) we should not remand for an evidentiary hearing because the superior court already determined that the recantation statements were not credible, and (2) an evidentiary hearing is unnecessary because the new witness and victim statements conflict with Scott's own statements that he had sex with DH. Contrary to the State's assertions, the superior court did not make any explicit credibility findings.

Instead, the superior court stated, (1) "The facts presented to the Court regarding key witnesses changing or recanting their testimony is not sufficient to overcome the Defendant's intelligent, knowing and voluntary Alford plea." CP at 96-97. (2) "The fact that evidence surfaces later that might cast doubt on the credibility of complaining witnesses will not automatically vacate an underlying sentence based upon a plea agreement that was entered which promised the Defendant unqualified immunity for what the State termed (and the Defendant did not contest) 'numerous other allegations of sexual crimes [in Pacific County].'" CP at 97 (alteration in original). (3) "The newly discovered evidence enumerated in Defendant's briefs is not unique or compelling to justify vacation of his sentence." CP at 98. And (4) "[o]ften, complaining witnesses change their testimony at a later date for a variety of reasons. The Defendant has failed to demonstrate that the complaining witnesses' statements at the time they were made were untrue." CP at 98.

## A. Criteria for New Trial

¶31 A superior court may not grant a defendant a new trial based upon new evidence unless he establishes " 'that the evidence (1) will probably change the result of the trial; (2) was discovered since the trial; (3) could not have been discovered before the trial by exercise of due diligence; (4) is material; *and* (5) is not merely cumulative or impeaching.' " *In re Pers. Restraint of Brown*, 143 Wn.2d 431, 453, 21 P.3d 687 (2001) (quoting *State v. Williams*, 96 Wn.2d 215, 222-23, 634 P.2d 868 (1981)); *see also State v. D.T.M.*, 78 Wn. App. 216, 221, 896 P.2d 108 (1995). The superior court may deny a motion for a new trial "when any one of these factors is absent." *State v. Macon*, 128 Wn.2d 784, 804, 911 P.2d 1004 (1996).

¶32 A witness or victim's recantation of earlier statements is generally considered new evidence. *Id.* at 799-800. The superior court must determine whether a witness's recantation is credible before considering the defendant's motion for a new trial based on the recantations, regardless of whether there is independent evidence supporting the defendant's conviction. *Id.* at 804. This rule applies even where the defendant entered an *Alford* plea. *State v. D.T.M.*, 78 Wn. App. 216, 221, 896 P.2d 108 (1995) (superior court erred by denying defendant's motion to withdraw *Alford* plea without holding evidentiary hearing to determine whether alleged victim's recantation was credible).

¶33 In an *Alford* plea, the defendant does not admit guilt but concedes that a jury would most likely convict him based on the strength of the State's evidence. *Alford*, 400

---

We note, however, that the superior court did not hold an evidentiary or other hearing at which it could interview these witnesses in person to determine the reliability of their recent recantations. Instead, the court decided that these written statements were unreliable because they conflicted with Scott's previous admissions to having had sex with DH when Scott believed that DH was of the age of consent. We further note that at the time Scott made this admission, he was seeking a SSOSA sentence, a prerequisite for which is admission to the charged crime.

U.S. at 37; *see also State v. Newton*, 87 Wn.2d 363, 372, 552 P.2d 682 (1976).

> Ordinarily, when a defendant pleads guilty, the factual basis for the offense is provided at least in part by the defendant's own admissions. With an *Alford* plea, however, the court must establish an entirely independent factual basis for the guilty plea, a basis which substitutes for an admission of guilt.

*D.T.M.*, 78 Wn. App. at 220. Thus, an evidentiary hearing to evaluate the continued reliability of this independent factual basis is all the more critical where a defendant's conviction is based on an *Alford* plea rather than on his admission or sworn trial testimony.

¶34 Scott does not challenge on appeal the lack of a factual basis for his 2001 *Alford* plea. Nevertheless, his newly discovered evidence calls into question whether there now remains sufficient evidence admissible under the corpus delicti rule[15] to support his plea and conviction. Independent of his *Alford* plea proceedings, Scott consistently maintained that DH was of the age of consent when they had sex and that he (Scott) had never confessed to having committed a crime. Now, the alleged victim, DH, whom the State could not locate at the time of Scott's 2001 sentencing, declares that Scott committed no crime against him. Thus, the chances of there being no competent evidence to support Scott's *Alford* plea are high, and the necessity of an evidentiary hearing is clear.

## B. *D.T.M.*

¶35 We find instructive *D.T.M.*, in which Division Three of our court addressed newly discovered evidence in the *Alford* plea context. In *D.T.M.*, the defendant's stepdaugh-

---

[15] Under the corpus delicti rule, a defendant's incriminating statement alone is not sufficient to support the inference that there has been a criminal act. *State v. Brockob*, 159 Wn.2d 311, 328, 150 P.3d 59 (2006) (citing *State v. Aten*, 130 Wn.2d 640, 655-56, 927 P.2d 210 (1996)). "[T]he State must present evidence independent of the [defendant's] incriminating statement that the crime [the] defendant *described in the statement* actually occurred." *Id.* (citing *Aten*, 130 Wn.2d at 656).

ter, MJ, told a neighbor and her mother that DTM had tried to rape her. *Id.* at 218. The State charged DTM with first degree child rape. The court held a hearing to determine MJ's competency and the admissibility of child hearsay. *Id.* DTM accepted the State's plea bargain offer and entered an *Alford* plea to the first degree molestation charge in exchange for the State's dismissing the first degree rape charge. *Id.* Four days later, however, MJ told her mother that she had "made up" the rape allegation because she was angry at DTM and wanted him "to get in trouble." *Id.* DTM moved to withdraw his *Alford* plea. *Id.* Without first establishing whether MJ's recantation was credible, the superior court denied the motion. *Id.* at 219. Division Three of our court reversed. *Id.* at 221.

¶36 Division Three noted that (1) without MJ's statements, DTM's *Alford* plea and conviction lacked factual support because there was no independent evidence supporting the charge; (2) MJ's recantation, if true, met all five criteria for a new trial; (3) DTM could not have discovered the recantation earlier with the exercise of due diligence "[g]iven the consistency of M.J.'s statements throughout the investigation and pretrial proceedings"; (4) DTM "could [not] have precipitated the recantation by acting differently"; and (5) if MJ had adhered to her recantation in open court while subject to cross-examination, existing law would require the superior court to permit DTM to withdraw his guilty plea and proceed to trial. *Id.* at 220-21.

### C. If True, New Evidence Would Meet All Five New Trial Criteria

¶37 Scott's new evidence, if true, contradicts and significantly calls into question the evidence available to provide a factual basis for his 2001 *Alford* plea—the original police interview with DH and DuFour's original statements to

police.[16] DH's recent affidavit and Fernlund's recent inter-
view statements, if true, meet the five criteria for a new
trial, especially in light of DuFour's significantly changed
story. This new evidence meets the first criterion because it
would probably change the result of a new trial. DH now
indicates not only that he never had a sexual relationship
with Scott, but also that he never told anyone that Scott
had sex with him; he also claims that he was out of the state
during the charging period. Fernlund's statement is clearly
a recantation of his earlier statement to police: He now
affirmatively admits to having earlier lied about seeing
Scott having sex with DH in order to "get [Scott] locked up."
If true, these new statements not only undermine the
factual basis for Scott's plea but also tend to prove that
Scott never had sex with DH and, thus, did not commit
third degree rape of a child.

¶38 This new evidence also meets the second and third
criteria: It was all discovered after trial. Scott likely could
not have discovered the evidence before his guilty plea
through the exercise of due diligence; it is highly unlikely
that anything Scott could have done would have precipi-
tated Fernlund's recantation. Given that by the time of
sentencing, the State was unable to find DH or his family, it
is unlikely that Scott could have discovered that DH did not
make the statements attributed to him in the probable
cause affidavit (or if he did make those statements, that he
would later recant).

¶39 Furthermore, the evidence, if true, meets the fourth
criterion for a new trial in that it strongly indicates that
Scott did not commit a crime; therefore, the evidence is
material. Finally, DH's and Fernlund's statements meet the

---

[16] As we have earlier noted, it appears that only the prosecutor's affidavit of
probable cause, which summarizes DH's interview and DuFour's statements, was
part of the record at the time Scott entered his *Alford* plea; and again, it is not
clear from the record whether the superior court used this affidavit to provide a
factual basis for Scott's plea.

fifth criterion because these statements are not merely cumulative or impeaching.[17]

## D. Credibility Hearing Necessary Despite Statements' Conflict

¶40 Although the superior court did not hold a credibility hearing, the State argues that the superior court properly found DH's statements unreliable because they conflict with Scott's statements. Scott argues that (1) the superior court should have held an evidentiary hearing to determine whether DH's recantation was credible after having the opportunity to observe DH testifying in open court despite his (Scott's) contrary statements; (2) if the statements are inconsistent, "only Scott knows the motivation underlying his statements, whether based on truth or some other concern"; and (3) his (Scott's) statements and DH's statements do not entirely conflict because the sex could have occurred after DH's 16th birthday when he returned to Washington following his release from custody.

¶41 In 2001, Scott (1) told the sentencing court that he and DH had had sex "about three" times after DH moved in with him, but Scott maintained he had believed DH was 18 years old at the time; and (2) consistently told the corrections officer who prepared the presentence report that he (Scott) had had sex with DH, but that he believed DH was 18 years old at the time.[18] Although Scott's

---

[17] In contrast, DuFour's recent interview could be considered "merely impeaching." In both her new and old statements, she claims that she observed Scott having sex with DH. While many of the details differ between her 2001 statement and her 2007 interview, DuFour has not recanted her earlier statement. Thus, her new interview might be used to impeach her previous statement that she observed Scott having sex with DH. In this sense, DuFour's recent interview, alone, would not meet all five of the new trial criteria. Thus, we do not consider this new evidence as a basis for reversing the trial court's denial of Scott's motion to withdraw his guilty plea.

[18] In its appellate brief, the State asserts that in a July 8, 2005 interview, Scott stated that DH had sex with him three times. But the State did not designate this interview as part of the record on appeal under RAP 9.6(a). Therefore, we will not consider the State's allegation or this 2005 interview. *Crista Senior Cmty. v. Dep't of Soc. & Health Servs.*, 77 Wn. App. 398, 412, 892 P.2d 749 (1995).

statements are inconsistent with DH's 2007 statement that he (DH) never had sex with Scott, DH's statement—that he was out of state during the charging period—is consistent with Scott's repeated statements that he had sex with DH only after DH was old enough to consent. Neither Scott's nor DH's statements, however, describe a crime.

IV. STATEMENT OF ADDITIONAL GROUNDS: ACTUAL INNOCENCE

¶42 In his statement of additional grounds (SAG),[19] Scott argues that "actual innocence should have been the only grounds raised" by his attorney. Scott attaches his trial attorney's motion for reconsideration, which cites *Schlup v. Delo*, 513 U.S. 298, 115 S. Ct. 851, 130 L. Ed. 2d 808 (1995). The Washington Supreme Court has cited *Schlup* for the proposition that "actual innocence" may constitute a rare "narrow exception allowed for consideration of a successive [personal restraint] petition" in " 'extraordinary cases[s].' " *In re Pers. Restraint of Turay*, 153 Wn.2d 44, 54-55, 101 P.3d 854 (2004) (alteration in original) (quoting *Schlup*, 513 U.S. at 321).

¶43 Scott is before us on direct appeal from the superior court's denial of his motion to withdraw his *Alford* plea, not on a successive personal restraint petition. Thus, we need not address whether the "actual innocence" successive personal restraint petition exception applies to a direct appeal. Furthermore, it is not necessary for us to delve more deeply into this exception because we are vacating the superior court's order on other grounds and remanding for the reference hearing that Scott has requested.

¶44 We vacate the superior court's denial of Scott's motion to withdraw his guilty plea and remand to the superior court to hold an evidentiary hearing to determine whether his new evidence is credible. If the superior court determines that the new evidence is credible, then the court shall reconsider Scott's motion to withdraw his *Alford* plea.

---

[19] RAP 10.10.

If the superior court determines that the new evidence is not credible, then Scott's *Alford*-plea based conviction stands.

BRIDGEWATER and ARMSTRONG, JJ., concur.

