COURT OF APPEALS, DIVISION III, STATE OF WASHINGTON

| | | | |
|---|---|---|---|
| STATE OF WASHINGTON, | ) | No. | 38887-5-III |
| | ) | | |
| Respondent, | ) | ORDER DENYING MOTION | |
| | ) | FOR RECONSIDERATION | |
| v. | ) | AND AMENDING OPINION | |
| | ) | | |
| J.A.M., | ) | | |
| | ) | | |
| Appellant. | ) | | |

THE COURT has considered appellant's motion for reconsideration and the answer thereto, and is of the opinion the motion should be denied. Therefore,

IT IS ORDERED, the motion for reconsideration of this court's decision of January 16, 2024 is hereby denied.

IT IS FURTHER ORDERED the opinion filed of January 16, 2024 is amended as follows:

The paragraphs on pages 18-19 that read:

At the start of the hearing on J.A.M.'s motion, J.A.M.'s counsel moved to exclude the police reports contained in Appendix A. The juvenile court noted the objection but reserved ruling on the motion. Toward the end of the hearing, the court addressed J.A.M.'s concerns regarding Appendix A. J.A.M. again objected to admission of the police reports. As a result, the juvenile court noted that the clerk's file contained the police reports and the

medical record. The court asked if it could review both because of their

placement in the file. J.A.M. did not object to the court's review and

consideration of the police reports. The following colloquy transpired:

> THE COURT: Okay. But is there any disagreement as
> far as the file itself being available for consideration in its
> entirety[?] . . . So, . . . if there's something that counsel is
> thinking shouldn't come into play as I'm looking at this, I just
> want to make sure that I'm abiding by that.
> MS. BARNES [defense counsel]: I don't think so,
> Your Honor. I don't know whether there would be a
> recording [of the plea hearing] anymore.

Report of Proceedings (RP) at 89-90.

In his 2004 guilty plea statement, J.A.M. agreed to the court

reviewing police reports to establish a factual basis for the plea. We find no

law on point, but logically an agreement to permit the court to review the

police reports for a factual basis for the plea should bind the accused if and

when he seeks to withdraw the guilty plea. A withdrawal of the plea also

entails the resolution of whether sufficient facts support the charged crime.

During the motion hearing, J.A.M. agreed to admission of the

medical record as an exhibit. Therefore, he waived any objection to the

review of the record.

shall be amended to read:

At the start of the hearing on J.A.M.'s motion, J.A.M.'s counsel moved to exclude the police reports contained in Appendix A. The juvenile court noted the objection but reserved ruling on the motion. Toward the end of the hearing, the court addressed J.A.M.'s concerns regarding Appendix A. J.A.M. again objected to admission of the police reports. The juvenile court explained its intention to review the entire case file, which included Appendix A and the police reports contained therein, when deciding on the issue of credibility and on J.A.M.'s motion and questioned the parties about whether they had any objection to that. J.A.M. did not object to the court's review and consideration of the entire case file. The following colloquy transpired:

> THE COURT: Okay. But is there any disagreement as far as the file itself being available for consideration in its entirety[?] . . . So, . . . if there's something that counsel is thinking shouldn't come into play as I'm looking at this, I just want to make sure that I'm abiding by that.
> MS. BARNES [defense counsel]: I don't think so, Your Honor. I don't know whether there would be a recording [of the plea hearing] anymore.

RP at 89-90.

ER 103(1) requires a party to detail the basis of any objection to testimony or exhibits. J.A.M. objected to the introduction of the police reports as an exhibit, but he never objected to the juvenile court's inclusion

of the reports in its deliberations.  One might argue that objecting to the reports impliedly registered an objection to the court's review of the reports.  But even if J.A.M. did not waive his hearsay objection at the plea withdrawal hearing, he had already waived that objection years earlier.

In his 2004 guilty plea statement, J.A.M. agreed to the court reviewing police reports to establish a factual basis for the plea.  In doing so, he waived his hearsay objection to those reports.  "The waiver doctrine provides that once a party has relinquished a known right, the party cannot reclaim it without the consent of the adverse party."  *White River Estates v. Hiltbruner*, 84 Wn. App. 352, 363, 928 P.2d 440 (citing *McDaniels v. Carlson*, 108 Wn.2d 299, 308, 738 P.2d 254 (1987)).  For this reason, the trial court was within its right to consider the police reports for credibility purposes at the plea revocation hearing.

PANEL:  Judges Lawrence-Berrey, Fearing, Pennell

FOR THE COURT:

_____
ROBERT LAWRENCE-BERREY
Chief Judge

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No.  38887-5-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| J.A.M., | ) | |
| | ) | |
| Appellant. | ) | |

FEARING, C.J. — J.A.M. appeals the superior court's denial of his motion to withdraw a guilty plea he entered in 2004 as a juvenile.  J.A.M. based the motion on the recantations of his mother and sister, the latter who he allegedly sexually touched when the two were minors.  Because substantial evidence supports the finding of the superior court that the recantations lack evidence, we affirm.

FACTS

This appeal concerns the prosecution of J.A.M., then a minor, in 2004, for sexual contact with his sister.  The arresting officer attested to the following narrative in a statement of arresting officer used for the juvenile court's preliminary finding of probable cause form in 2004:

On 06/09/2004 sometime around 2200 and into the morning hours of 06/10/2004 [J.A.M.] did enter the bedroom of the juvenile female victim

> [A.M.] through the window . . . [in] Yakima County and then forced her to remove her clothes and got on top of her and placed his penis against her vagina on top of her underwear and began to move his hips up and down. During this time he offered her items such as CD's and jewelry if she would allow him to do this and threatened her in other ways—verbally.
>
> During an interview with the female juvenile victim it was revealed that [J.A.M.] did this same thing on at least two other occasions. In December of 2002 . . . in Olympia, WA he forced the juvenile female victim to undress completely and then got on top of her and pulled his penis through his boxer shorts and then rubbed it against her vagina and then against her leg and abdomen and moved his hips against her in and up and down motion. The two were discovered under the covers together by Olga Smith. In August of 2003 . . . in Wapato . . . [J.A.M.] forced the female juvenile victim to remove her clothes and removed some of her clothing his self and then held her down and rubbed his penis against her vagina and the area of her vagina.
>
> According to the female juvenile victim she never allowed [J.A.M.] to put his penis inside her however there were times when he would be "humping" her and it did hurt. She also disclosed that prior to December 2002 when she lived with her father in Yakima that she and [J.A.M.] and other kids would play truth or dare and he would touch her during those times.

Clerk's Papers (CP) at 11.

On July 16, 2004, the State of Washington charged J.A.M., age thirteen, with three counts of indecent liberties. On August 4, 2004, the State amended the information to dismiss the three counts of indecent liberties and to plead a charge of second-degree incest. On August 4, J.A.M. pled guilty to the one charge by way of an *Alford* plea. J.A.M.'s guilty plea statement declares:

> Instead of making a statement, I agree that the Judge may review the police reports and/or a statement of probable cause supplied by the prosecutor and/or my attorney to establish a factual basis for the plea.

CP at 7.

2

The only evidence against J.A.M. supporting the *Alford* plea was Olga Smith and A.M.'s reports. CP 26. Smith is A.M.'s and J.A.M.'s mother.

Juvenile Court Judge James Gavin accepted the plea. Judge Gavin sentenced J.A.M. to thirty days in detention, one year of monitoring, and counseling.

PROCEDURE

On July 22, 2019, J.A.M. filed a motion to vacate his conviction and withdraw his *Alford* guilty plea. J.A.M. claimed he had been falsely accused of incest.

In support of J.A.M.'s motion, Olga Smith and A.M. signed declarations. The State filed a response, which attached an "Appendix A." The appendix included a medical record about A.M.'s treatment and police reports containing Olga Smith and A.M.'s allegations against J.A.M. The medical report recorded A.M.'s allegations of sexual abuse in 2004.

The superior court conducted a hearing to review J.A.M.'s motion to vacate his conviction. At the beginning of the hearing, J.A.M. moved to exclude the police reports contained in Appendix A. The superior court noted the objection but reserved ruling on the motion.

Olga Smith and A.M. testified during the hearing. We recite the portions of Smith's testimony:

> Q What you're describing as promiscuity, what did that consist of?
> A Like you know, finding them [J.A.M. and A.M.] under—under the covers or under the bunkbeds. And I didn't witness anything myself happening, I would just, you know, walk in on something and they'd be like for one instance, one time specifically, I had walked in and they were

3

semi-underneath the bunkbed.  You know, they were little.  And [A.M.] was like well, no, I don't want to, don't do that.  Saying things like that.  I'm like what's going on.  And so, I lifted up the blanket and—and I could see that, you know, they were doing some fondling or trying to do something along the lines.  And she was saying, you know, don't do that.

Q And how old were they when that happened?

A So, that would have been like '97 and '98.

Q And how is it that you can remember that it was about—

A Because [J.A.M] got hit pretty bad.  You remember that as a parent.  And you're just like what is going on here.  And I can only relate it, you know, to my personal experience, you know, the kissing cousins.  And I'm like well, okay, I know that me with my cousins when I was young in California.  And you know, I just need to teach them this is inappropriate and this is not okay.  You're brother and sister.  This is not okay.  And I'm like I understood, you know, it's probably the pornography and stuff that they've been seeing.  And so, we would go at it, I would be fighting with my ex—with my husband about this issue because he would hit [J.A.M] and he would, you know, really go overboard and I'm not talking about spanking.  I'm talking about, you know, beating him good when he was just a little boy.  And I remember [J.A.M.] had a problem at that time just of literally like defecating himself.  I mean he was so terrified in having to face his father.

Report of Proceedings (RP) at 19-20.

Some of Olga Smith's testimony concerned difficulties she encountered in raising J.A.M.  By 2019, Smith, A.M., and J.A.M. claimed these difficulties constituted the primary, if not sole reason, why she reported J.A.M.'s alleged touching of his sister.  The three also contended that Smith manipulated A.M. into lying about J.A.M. in order to get assistance from the authorities in caring for J.A.M.

A By 2004 we were living at 181 Cougar Lane.  And by that time, things had escalated in the sense of between [D.M., J.A.M.'s brother,] and [J.A.M.].  And in the sense of them, it was chaos.  They were—they were out of control . . . But when we moved into the neighborhood, the neighbors started coming, the police was starting to get called, people tried breaking into their houses.  So, it was just constant stress.  They're sneaking out at

4

night. They weren't there a lot of the times. They were out with their friends, running the streets, sneaking them in the house. It was just non-stop. I actually filed an At Risk Youth for them. I actually filed an At Risk Youth in Olympia. I filed an At Risk Youth in Yakima, Washington. I reached out to DSHS. This is how bad it was getting in our house with the boys. I just, I have no control.

RP at 22.

Q So, what else did you do besides the filing of At Risk Youth petitions in an effort to help with your sons, and specifically, with [J.A.M.]?
A I tried reaching out to my ex-husband and I went to DSHS to try and get counseling and they sent someone to the house to try and do some kind of counseling with the kids. I took them to DSHS because nobody seemed like they really wanted to participate or do anything. I went to my pastor. Tried getting counseling from him for the boys. I filed a—I filed the petitions, put security things up on the doors and on the windows to try to catch them when they were sneaking out. Called the police. I really tried to stick to the At Risk Youth thing. But all I can do is just call on the phone and—and say this is what's happening and they're not listening to me and there was not really any solid like they would come and physically apprehend them. It wasn't like that. It was just a bunch of calling and a bunch of reporting.
. . . .
Q So, against that backdrop, that's when you called the police?
A Yes.
Q Tell me how you came to make the—came to the decision to do that?
A Well, first of all the At Risk Youth. So, I have to report everything that's going on. But the police would be calling me as well at times. Like if something would happen and they were suspecting the boys, you know, do you know where they were, do you know where they are right now? So, yes, I called the police when—when those things would happen. But the kids wouldn't speak. They wouldn't speak up and say yes, this is what happened, it was [J.A.M.] that hit me or it was [D.M.] that made us fight. They weren't—they weren't saying that to me, even though I did speak with the children when we were alone. I'm like you have to tell me. You have to tell me because if I call the police and we keep doing this and you don't say anything to them, we're just wasting our time. Nothing—nothing is gonna happen. It was really frustrating because I couldn't—I

couldn't bring like the justice or the attention to make things change. I could—I felt like I could only go so far.

Q Right.

A With the risk—At Risk petitions, with the calling the police, but then what?

Q So, in July I believe or sometime in the summer of 2004—

A Mm-hmm.

Q —you called the police and reported something between [J.A.M.] and [A.M.]?

A Yes. So, what had happened is we had come home from a Wednesday night bible study. And we came to an empty house. Our huge stereo system was gone, our electronics were gone. I had just bought my husband a brand new $400.00 air compressor in the garage. All his stuff, his tools, his compressor, we were wiped out. And I just, I'm like I'm done. I think I was just; I'm done. And [A.M.], you know, as young as she was back then, you know, all the issues that had happened when they were little, you know, they had stopped happening, but it continued in other ways and then it was physical abuse and the fighting and everything. And I said, you know, if I went to her and I told her and I convinced her like, you know, if we really want this to stop, you know, you need to go to somebody and tell somebody. I wanted to take her to somebody to say hey, this is what happened. But I did it on the premises of like leading her, letting her know make it like it just happened. But in her mind, I was reminding her remember with [J.A.M.] when I caught you specifically under the bed? Remember with [J.A.M.] when you guys were—got in trouble by dad and [J.A.M.] got a spanking? Do you remember that? And so, I was really trying to bring this out on her, remember what happened. But like I said, my premises was for her to say that something just recently happened, not—not a few years ago, but you know, if I could get her to say that that something recently happened and that he attacked her or it was really bad, then I could go to the police with something solid and I could say this is what he did. And they would have to remove him out of my house. Because I had tried everything else and I just couldn't have him in my house anymore.

Q So,—

A I even tried surrendering him to DSHS. That was one of the final straws. I mean you should actually be able to go to DSHS and say look at all this happening, look at what's happening in the home, it's unsafe for him to be here and they didn't take him.

Q So, you encouraged [A.M.] to say that these things had happened more recently?

6

A Yes.

Q Did you also encourage her to say some things that were not true at all?

A I did.

Q Can you describe what those were?

A I wanted her to say that he had sexually like attacked her and to use those words like attacked, you know, that he sexually attacked you and—and I prompted her with my words and with the memories to say that it had recently happened. And I had told her, I said remember what those steps that we seen outside of the—the window, you know, there were steps out there. That that was something different. She had a boyfriend. His name was Noie, who was sneaking into the house. But I—I was using some things that had happened, but that happened in the past and maybe some recent events to try to get her in her mind to share this information that something really bad did happen.

. . . .

Q So, let's talk about, did you take her to see a doctor?

A I took her to see the police first. I wasn't gonna take her to the doctor. But after speaking with the police and they were questioning me, but they kept coming back to question me, question me about like the dates that I was saying. Like they wanted to make sure like are you sure? And I felt then, you know, they're onto me because I had already said a few things, they were like well, this—this is not really falling into place what you're saying. But at that time, I didn't realize [J.A.M.] was actually in jail when I was saying all this happened. So, I don't know if that's why they kept asking me, but the police officer that I was speaking with took [J.A.M.]'s information, gave it to another officer, he went and did a, I don't know what, but he came back and that's when he started asking me if I was sure about this date that I was saying. And I said oh yes, yes, it was very recent. It was like just the other day. Like the day before. I wanted it to be very recent. And that's why they kept—kept questioning me.

Q And were—

A And I was with the police.

Q —and were you with [A.M.] when you took her to the police?

A Yes.

Q Did they interview her by herself or with you present?

A First, we were together and they asked us questions and then after they took [A.M.] in a room.

Q What about at the doctor, were you with her the entire time that she was at the doctor's office?

7

A I don't remember that. No, there was a little period of time where the doctor wanted to speak with her alone and I said that was fine. So, after that, so after the questioning, the police officer came and said you know, it would help if there was some kind of rape test kit or something and I didn't want that because I knew—I knew nothing was gonna be of it and I didn't want to put my daughter through that, but I was desperate enough to say well, I guess we can try it just to make it look good on record hey, she had a rape test done. So, I did. I went from there and it wasn't a doctor's. I actually took her to St. Elizabeth's and seen, there was a special doctor that seen her there.

Q Okay. So, when—

A And I reminded her before we went to try and say the same thing that I had told her to say at the sheriff's about, you know, her being sexually assaulted and how bad it was. So,—

Q So, when you took her to the police, as well as the doctor, were you disappointed at all in what she ended up saying?

A Yes.

Q And why was that?

A Because it was very minor. It was very minor and I was—my attempt I felt like failed. I'm like this again is gonna nowhere. Here I am after all of this and all of these attempts. I really thought this was gonna be the thing that was gonna get him out of the house. And—and then after the doctor seen her and he's like he didn't really find anything. In fact, he didn't find anything at all. There was no evidence of anything.

Q So, what were you hoping to accomplish ultimately by making that accusation?

A That it would be maybe criminal that it would be bad enough for somebody to say this is really bad so somebody's gotta come in here and take care of this, get him out of my house. I wasn't even so much to punish him. I just wanted him out of the house and away from the kids. That was my ultimate—my ultimate plan anyway.

Q And did that end up happening?

A Nope.

Q So, let's talk about why you're here today. At some point, did you make a decision to come forward with what you're telling us today?

A I did.

Q Tell us how that came about?

A It came about I would say about two years, about two years. [J.A.M.] and I have come along way. The [J.A.M.] that went in is not like the [J.A.M.] today. And so, as our relationship has grown, mainly through his son, because the child that I have is actually [J.A.M.]'s baby. So, when

[J.A.M.] went into prison, he had a baby he didn't know about it. I was being given custody of [the baby] and that through the years has, you know, drawn us closer. And in one of our conversations that we had about the past, you know, it was one of those moments he was asking me for forgiveness. He's like mom, I know I was really messed up as a kid. And—and I apologize for that. You know, and these the reasons and I understand a lot of it was us as parents. That was on us as his parents. And I was apologizing to him. You know, I remarried. Selfish. I put myself first above my children really. And—and as we're having this conversation, you know, a little deeper as our relationship was growing, and we were talking about the situation with [A.M.]. And—and I said, [J.A.M.] I said did you even know that really in the end what makes me feel the worst now, I said I can't say that in the past that I felt bad, because I didn't. Because after he went to prison on something completely different. He went to prison on something else. My conscience in time started to get to me because of the charge.

RP at 25-35.

Q Some of the things you said. You were talking about finding the kids under the bunkbed?
A Yes, sir.
Q Have you ever seen them touch each other inappropriately?
A I've not—
Q So, I'm—
A I've seen them under the bed twice.
Q I know you've been—I know you're [sic] mom and I know you've talked to your kids and I know you've had conversations with your kids. But what I'm asking is, have you seen it or have you been told it?
A Both.
Q What did you see that was inappropriate?
A I seen them underneath the blanket and heard my daughter saying stop doing that.
Q But did you see what the—what she was talking about?
A No.

RP at 42-43.

Q After the doctor, when you said you were upset about the minor allegations, did you communicate that to your daughter?

9

A That was a long time ago. I don't remember. I know I was upset probably on my face.

Q Yeah. You don't remember talking—

A But say anything to her—

Q Well, you've said several times you've prompted her about what to say.

A Yes, sir. Yes, I did.

Q Did you prompt her what to say when she was recorded privately with the police?

A I wasn't allowed in there.

Q No, but I mean because what you—

A Ahead of time yes, I did speak with my daughter.

Q Okay.

A Ahead of time before we went there. That's why we went there.

RP at 44.

A.M. testified at the hearing on the motion to vacate J.A.M.'s conviction. She

agreed that J.A.M. sexually abused her but at a time other than alleged by the State.

Q So, you mentioned just now that after the sexual abuse stopped there was physical abuse and other things.

A Right, yeah.

Q Do you remember when the sexual abuse stopped?

A I don't remember specific days or ages, but I do remember the last time that it happened. It was in Olympia in a house that we lived up on a hill. It was a two-story house and it was up in the upstairs bedroom.

Q Do you remember what road that house was located on?

A I think my mom said it was Silvonview [sic].

Q And do you—what do you specifically remember other than that? Why do you know that that was the last time?

A Well, I specifically remember almost every incident that happened. It was kind of an on and off, but constant throughout the years. And then I remember that it was the last time because I remember thinking after that I was wondering why it—why it had stopped and thinking that every time he came to a room or every time he was at the house that something would happen, but it never did.

Q And do you remember how old you were at that time when it stopped?

A I want to say about eight or nine.

10

RP at 60-61.

Q Now, do you—are you aware about what happened to [J.A.M.], after the—after you talked to the police and the doctor?

A I did not know actually until just when this started happening. So, a couple years ago when I got that phone call from my mom about writing the letter that I wrote. I didn't even know that he was even—that anything had even come of—of that. Like I didn't see any of the consequences happen and I didn't—I didn't know. I had no idea. And so, I didn't know that he was even on the sex offender's list until just recently a couple years ago.

Q So, what—what's your understand [sic] about why it is that you're here.

A So, originally, my understanding because based on what my mother had told me was that [J.A.M.] was in some sort of court proceedings already. This is before I had written the letter. And that he was on the sex offender's list because of something that she had done, because of a lie that she had told, and she wanted me to like help her get it straight. And that was the first of that—the first time I had even heard that I was even involved in this at all.

Q And as far as you can recall, at the time that you talked to the police officer, had it been a recent thing, the abuse?

A No, that's why it was surprising actually. Because it had been like years by the time that any of that even happened. By the time that my mom came to me at my grandma's house and had that conversation with me that oh, we need to get you help, it had already been years since anything had happened like that. Anything sexual anyway. Physical, yes. We definitely got in fights and my brothers have gotten in fights throughout the years, all the way up until—I want to say until I was like 13 or 14. But there was no sexual abused for years by the time my mom actually decided oh hey, you need help, which I thought was weird, but I also just felt comforted by the fact that she actually wanted to help. So,—

Q Do you know how many years it had been?

A I don't. I just know it had been a long time.

Q So, what would you say prompted you to write the declaration?

A Like I said, my mom calling me and saying hey, you know, you need to right this wrong. I lied about a lot of stuff and I just need you to, you know, tell the Courts the truth, because it could potentially get [J.A.M.] off the sex offender's list. And I said I didn't even know that he was on that list. But okay.

11

. . . .

Q Thank you.  Okay.  So, there was sexual abuse starting from age five?

A Yes.

Q And it continued for some period of time, but you don't know exactly how long it continued?

A Right.

Q Okay.  Did that involve touching you?

A Yes.

Q Inappropriately, as in—

A Yeah.

Q Okay.  And that your understanding of why you're here today is to attempt to get him off the sex offender registry?

A Right, which he shouldn't be on because my mom apparently manipulated the system to where he had to do that.  So,—

Q And your understanding of that is directly from your mom? It's nothing you know personally?

A Right.

RP at 64-67.

Near the end of the motion hearing, the superior court engaged in a colloquy with

counsel about the use of Appendix A:

THE COURT: Yeah, I'm—so, and also, we haven't really addressed defense's concerns and I don't know if we want to do that now.  I suppose we can.  As to the documentation that was attached to the State's briefing.  Mr. Porter, because you've not admitted it, per se,—

MR. PORTER [the State's counsel]: Correct.

THE COURT: —it's attached to your briefing.

MR. PORTER: Correct.

THE COURT: Okay.  So, any other, Ms. Barnes, you were objecting to that being attached.  So, I guess, let's revisit that and try to clean up that piece where we started this morning.

MS. BARNES [defense counsel]: I am objecting, Your Honor.  Those reports are hearsay.  I don't think that they can be admitted or considered by the Court.

With regard to the medical report, however, we do not object to that.  However, we think that it should be sealed.

THE COURT: All right.  Mr. Porter?

12

MR. PORTER: Your Honor, those were not admitted for testimonial or evidentiary purposes. But they were admitted to make points consistent with briefing on the matters. So, as far as they pertain to briefing and legal discussions, those are appropriate to have in the briefing. As far as they apply to the hearing to vacate, they were not admitted.

THE COURT: All right. So, I will grant defense's motion from the standpoint that they're medical and they're not separated out here. The medical records, I think it would be appropriate to seal those. And if the State is not otherwise relying on the, I'm gonna call them the police reports themselves, that are specific to—so, it's all under Appendix A. So everything under Appendix A, other than the medical report, which starts, I think it would be appropriate—

RP at 71-72.

THE COURT: . . . So, I—obviously, I just want to make sure we're all on the same page. We have the documents that are part of this file under the 04-8-1192-3 cause number that the Court has available to it just by virtue of looking at the file, which did incorporate, . . .

And I guess I say that because I mean the entire file is considered by the Court or I think is appropriate to be considered by the Court in making its decisions today, but I want to see if anybody is in disagreement with that.

RP at 88-89. Without hearing any objection, the court commented:

THE COURT: Okay. But is there any disagreement as far as the file itself being available for consideration in its entirety, I guess is what I'm saying, because we've got the Amended Information, we've got the guilty plea form. I was just looking very briefly because on our current disposition orders there is boxes that are checked indicating that there had been a parent present or, you know, had addressed the Court for purposes of sentencing. These are not that specific to know whether there was a parent present or not and I have no idea if there would be an independent. Nobody has offered it to me anyway by way of a transcript of the colloquy or anything that would have taken place when the plea was taken back in August 4th of 2004.

So, I just—if there's something that counsel is thinking shouldn't come into play as I'm looking at this, I just want to make sure that I'm abiding by that.

13

RP at 89-90. Counsel for J.A.M. replied "I don't think so, Your Honor." RP at 90.

The juvenile court denied J.A.M.'s motion to vacate his guilty plea. The court's findings of fact read:

> 2. The court was not provided with a transcript of the taking of the plea of guilty or the entry of the disposition order by either party. The court did state it knew the following facts for a certainty:
> a) Jennifer Barnes [defense counsel] had, and has, an excellent reputation in the juvenile area of law. At the time, she was a senior attorney with the juvenile court. [J.A.M.] had a very experienced counsel representing him.
> b) The court is knowledgeable of Judge Gavin. He was on the Yakima County Superior Court bench from 1983 until 2013. Judge Reukauf began appearing in front of Judge Gavin in 1989 when she moved to Yakima County, and she became his colleague in 2004 until 2013. Judge Gavin had a reputation for the length of the colloquy he had when taking a guilty plea. This court does not have any question regarding the thoroughness of the colloquy during the plea or the validity of the plea.
> c) Between Ms. Barnes and Judge Gavin, the court was satisfied the original plea in 2004 was knowing, intelligent, and voluntary when the court took the plea even though it was an Alford plea.
> . . . .
> 4. The court reviewed Appendix A only as it related to Olga Smith's and A.M.'s credibility, and for no other purpose than that. It was relevant and appropriate under these circumstances to use Appendix A in a review of credibility. In Appendix A, the State submitted all of the original police reports.
> . . . .
> 8. From the plea and sentencing documents, the court could tell [J.A.M.] had been on probation for two previous felonies beginning when he was twelve years old. The court stated Ms. Smith would have been familiar with the system and how to obtain assistance based on [J.A.M.]'s probation and her filing the At-Risk Youth petition.
> 9. Ms. Smith put emphasis on her efforts to manipulate her A.M.'s statements despite having experience within in the system.
> 10. Ms. Smith wanted the allegations from A.M. to be more serious than they were, but it is unclear how that would have been different than charging and pleading to a sexual offense.
> 11. There were at least two instances where [J.A.M.] was not in Ms.

14

Smith's home.

a) The At-Risk Youth petition fact finding from 2003 was issued by Commissioner Inouye. This court is familiar with him as a colleague for a number of years. The At-Risk Youth petition ordered CPS to investigate the allegations by [J.A.M.] that his step-father abused him. [J.A.M.] was to be placed in licensed care until that was complete. He was removed from the home as a result of the petition.

b) In the reports themselves, [J.A.M.] was staying with his grandmother in Wenatchee. Ms. Smith was able to remove [J.A.M.] from the home.

12. Both removals undercut Ms. Smith's credibility when she says she manipulated A.M.'s testimony simply to have [J.A.M.] removed from her home

. . . .

14. Ms. Smith's birthdate was 1970, and she was married at eighteen in 1988. She was divorced seven years later in 1995. Shortly after the divorce, she remarried and moved to the Olympia area the older three children, [D.M.], [J.A.M.], and A.M., came to visit often for the first year, and then moved to live with her. She wasn't sure when she obtained full custody, but the father agreed to the arrangement.

15. Ms. Smith testified she remembered 1997 and 1998 because it was when [J.A.M.] was beat up by his father, and "you don't forget that." It doesn't fit with the timeframes she testified to because she would have been divorced by 1995 and living with her new husband

. . . .

17. It further undercuts her credibility that her older son [D.M.] was as equally out of control as [J.A.M.] and caused the same issues. There is no indication she felt similarly about [D.M.] as she did about [J.A.M.].

. . . .

19. This court does not need to be clear on a motive.

a) This court notes Olga is raising [J.A.M.]'s special needs child.

. . . .

20. Ms. Smith testified she never saw actual sexual contact between [J.A.M.] and his victim.

21. The court did not find Olga Smith's testimony credible.

22. A.M.'s testimony lacked specificity.

23. A.M. testified she believed her testimony would help [J.A.M.] get off the sex offender registry.

24. A.M. testified sexual abuse began occurring at age five but could not state when it stopped.

25. A.M. was very consistent in statements made to law enforcement

15

and medical personnel in 2004 as detailed in Appendix A.
        26. A.M.'s prior statements do not match her present statements, and
the court did not find A.M. to be credible.

CP at 74-78.

The juvenile court entered the following conclusions of law:

        6. The witnesses' [sic] were found not credible.  As such, the court
did not reach the analysis of the recantations as new evidence; the
recantations failed the threshold determination of reliability.
        7. The motion to vacate the conviction for Incest in the Second
Degree is denied

CP at 79.

## LAW AND ANALYSIS

On appeal, J.A.M. contends the juvenile court abused its discretion when relying

on the police report and medical records attached to Appendix A when resolving his

motion to vacate his guilty plea.  J.A.M. further contends the police report and medical

record contained inadmissible hearsay.  He adds that neither document could be used by

the court even for impeachment purposes.  In turn, J.A.M. argues that the juvenile court

abused its discretion when denying his motion to vacate his guilty plea.  In so arguing, he

assigns error to many findings of fact as not substantiated by the evidence.

In response, the State does not directly address J.A.M.'s assertion of lack of

authentication of the documents attached to Appendix A.  The State contends that J.A.M.

waived any objection to Olga Smith's and J.A.M.'s statements in the police reports

because, although J.A.M.'s counsel objected to hearsay contained in the reports, the

objection was insufficient to preserve the issue for appeal as the trial court reserved ruling

16

at the time and J.A.M. twice failed to later renew the objection. The State argues that

J.A.M waived any objection to the medical reports because counsel for J.A.M. explicitly

indicated that she did not object to the State including the report in Appendix A.

Use of Appendix A Attachments

We first address whether the juvenile court could consider the medical record and

police reports attached to the Appendix A. The Washington rules of evidence applied to

the hearing on J.A.M.'s motion to withdraw his guilty plea. ER 101 declares:

> These rules govern proceedings in the courts of the state of
> Washington to the extent and with the exceptions stated in rule 1101.

By the time of the motion to withdraw the guilty plea, J.A.M. had reached adulthood.

The parties do not address whether the juvenile court rules applied to the motion when

J.A.M. entered the plea as a teenager. Regardless, JuCR 1.4(c) provides:

> Evidence Rules. The Rules of Evidence shall apply in juvenile court
> proceedings to the extent and with the exceptions stated in ER 1101.

(Boldface omitted.) ER 1101 lists numerous exceptions to application of the evidence

rules, but does not mention a motion to withdraw a guilty plea.

Application of evidence rules to the hearing on J.A.M.'s motion to withdraw does

not assist him, however, because of a waiver rule. ER 103 reads:

> (a) Effect of Erroneous Ruling. Error may not be predicated upon a
> ruling which admits or excludes evidence unless a substantial right of the
> party is affected, *and*
> (1) *Objection.* In case the ruling is one admitting evidence, a timely
> objection or motion to strike is made, stating the specific ground of
> objection, if the specific ground was not apparent from the context.

(Boldface omitted) (some emphasis added).

At the start of the hearing on J.A.M.'s motion, J.A.M.'s counsel moved to exclude the police reports contained in Appendix A. The juvenile court noted the objection but reserved ruling on the motion. Toward the end of the hearing, the court addressed J.A.M.'s concerns regarding Appendix A. J.A.M. again objected to admission of the police reports. As a result, the juvenile court noted that the clerk's file contained the police reports and the medical record. The court asked if it could review both because of their placement in the file. J.A.M. did not object to the court's review and consideration of the police reports. The following colloquy transpired:

> THE COURT: Okay. But is there any disagreement as far as the file itself being available for consideration in its entirety[?] . . . So, . . . if there's something that counsel is thinking shouldn't come into play as I'm looking at this, I just want to make sure that I'm abiding by that.
> MS. BARNES [defense counsel]: I don't think so, Your Honor. I don't know whether there would be a recording [of the plea hearing] anymore.

RP at 89-90.

ER 103(1) requires a party to detail the basis of any objection to testimony or exhibits. J.A.M. objected to the introduction of the police reports as an exhibit, but he never objected to the juvenile court's inclusion of the reports in its deliberations. One might argue that objecting to the reports impliedly registered an objection to the court's review of the reports, but J.A.M. never stated such. More importantly, J.A.M. never informed the juvenile court of a basis on which the court could not consider the reports filed in the clerk's file.

18

In his 2004 guilty plea statement, J.A.M. agreed to the court reviewing police reports to establish a factual basis for the plea. We find no law on point, but logically an agreement to permit the court to review the police reports for a factual basis for the plea should bind the accused if and when he seeks to withdraw the guilty plea. A withdrawal of the plea also entails the resolution of whether sufficient facts support the charged crime.

During the motion hearing, J.A.M. agreed to admission of the medical record as an exhibit. Therefore, he waived any objection to the review of the record.

Withdrawal of Guilty Plea

Although J.A.M. does not expressly so argue, we assume that, even with a ruling affirming the superior court's consideration of the contents of Appendix A, J.A.M. contends the superior court abused its discretion when denying his request to withdraw his guilty plea. We disagree.

This court reviews a trial court's decision on a motion to vacate a guilty plea based on newly discovered evidence for an abuse of discretion. *State v. Olivera-Avila*, 89 Wn. App. 313, 317, 949 P.2d 824 (1997); *State v. Florencio*, 88 Wn. App. 254, 258, 945 P.2d 228 (1997). CrR 4.2(f) governs a motion to withdraw a guilty plea. The rule prescribes:

> The court shall allow a defendant to withdraw the defendant's plea
> of guilty whenever it appears that the withdrawal is necessary to correct a
> manifest injustice.

If the defendant brings his or her motion for withdrawal of the plea after entry of the judgment and sentence, CrR 7.8 governs resolution of the motion. CrR 7.8(b)(2)

19

provides, in relevant part, that a court "may relieve a party from final judgment" based on "[n]ewly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under rule 7.5." The defendant must establish the following in a motion to obtain a new trial based on newly discovered evidence:

> [T]he evidence:
> (1) will probably change the result of the trial;
> (2) was discovered after the trial;
> (3) could not have been discovered before trial by the exercise of
> due diligence;
> (4) is material; and
> (5) is not merely cumulative or impeaching.

*State v. Macon*, 128 Wn.2d 784, 799-800, 911 P.2d 1004 (1996) (internal footnotes omitted). If the defendant fails to establish any one of the five factors, the trial court may deny the defendant a new trial. *State v. Macon*, 128 Wn.2d 784, 799-800 (1996).

The law deems recantation "newly discovered evidence." *State v. Macon*, 128 Wn.2d 784, 799-800 (1996). Nevertheless, recantations are inherently questionable. *In re Personal Restraint of Clements*, 125 Wn. App. 634, 641, 106 P.3d 244 (2005). The superior court must determine whether a witness's recantation is credible when considering the defendant's motion for a new trial, regardless of whether independent evidence supports the defendant's conviction. *State v. Macon*, 128 Wn.2d 784, 804 (1996); *State v. Scott*, 150 Wn. App. 281, 294, 207 P.3d 495 (2009). Otherwise, the recantation will not likely change the outcome of the trial. The rule demanding an assessment of the recantation applies even when the defendant entered an *Alford* plea. *State v. Scott*, 150 Wn. App. 281, 294 (2009). When the trial court, after careful

consideration, has rejected such testimony or has determined the recantation to be of insignificant value, an appellate court will not lightly reverse. *State v. Macon*, 128 Wn.2d 784, 802 (1996).

J.A.M. challenges numerous findings of fact entered by the juvenile court. He challenges finding of fact 2 as not supported by substantial evidence because the trial court speculated that he pled knowingly, intelligently, and voluntarily due to the reputation of J.A.M.'s attorney and that of the presiding judge. Nevertheless, the State carried no burden to show an intelligent or involuntary plea. The defendant bears the burden of proving a manifest injustice required for withdrawal of a guilty plea. *State v. Ross*, 129 Wn.2d 279, 283-84, 916 P.2d 405 (1996). This burden may extend to showing an involuntary plea. *State v. Wilson*, 162 Wn. App. 409, 414, 253 P.3d 1143 (2011). Thus, regardless of whether the superior court relied on the reputation of the juvenile court judge and defense counsel lacks relevance when J.A.M.'s evidence failed to show an involuntary plea.

Substantial evidence supported other findings of fact or the findings lack bearing on the ultimate finding that Olga Smith's and A.M.'s recantations were not credible. A.M. admitted some abuse had occurred. Also, the superior court was free to use the police reports and medical record when determining the credibility of the mother and sister.

## CONCLUSION

We affirm the juvenile court's refusal to vacate J.A.M.'s guilty plea.

21

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____, J.
Fearing, C.J.

WE CONCUR:

_____,
Lawrence-Berrey, J., result only

_____, J.
Pennell, J.